Argued December 18, 1957, affirmed April 23, 1958

# SLOAN *v.* JOURNAL PUBLISHING CO., AMERICAN NEWSPAPER GUILD ET AL

324 P. 2d 449

*Manley B. Strayer,* Portland, argued the cause for defendant-respondent. With him on the brief were Henry T. Lowe, and Hart, Spencer, McCulloch, Rockwood & Davies, all of Portland.

*Gunther F. Krause,* of Portland, argued the cause for plaintiffs-respondents. With him on the brief were Krause, Evans & Lindsay, and Dennis Lindsay, of Portland.

*Robert R. Rissman,* of Los Angeles, California, argued the cause for defendants-appellants. With him on the brief were Anderson, Franklin & Landye, of Portland, and Irving Leuchter, Newark, New Jersey.

BRAND, J.

This is a suit by the plaintiffs, representing themselves and 63 other persons similarly situated, against the American Newspaper Guild and the Portland Newspaper Guild, unincorporated associations, and certain named individuals who are officers of one or the other of the guilds. The other defendant is the Journal Publishing Company, a corporation. Plaintiffs base their claim upon their alleged rights arising from con-

tracts which they and those whom they represent have made with the Journal Publishing Company, hereinafter called the Journal. These contracts are described as "Wholesale Dealer Agreements" under which the Journal agreed to sell copies of the Journal's newspaper to the dealers at wholesale and to give to each of them respectively exclusive territory within which to dispose of the papers at retail, and the dealers agreed to buy and pay for such papers and to promote the circulation of the paper in their respective districts. Plaintiffs ask for a decree enjoining the Journal from terminating or breaching those contracts and restraining the other defendants from forcing the Journal by threats of strike and picketing to terminate the contracts with plaintiffs.

The Journal filed an answer and cross complaint. The other defendants demurred to the complaint of plaintiffs and to the cross complaint of the Journal. The demurrers were overruled and the case was tried on the merits, based on general denials by the defendants other than the Journal. A decree was entered substantially in accordance with the prayer of the complaint. The defendants other than the Journal appeal. Hereafter we shall refer to the two guilds and their named officers as the "defendants" and we shall refer to the other defendant simply as "the Journal." We deem it unnecessary to summarize the intricate allegations of the pleadings at this time. The issues will be made clear in our statement of the facts. In brief, the defendants claim rights under a contract of 30 November 1951 between the Journal and the Portland Guild, a labor union, and they assert that the wholesale dealers' agreements which were thereafter made between plaintiffs and the Journal violated the contract of 30 November 1951 between the Portland

Guild and the Journal. The Journal, like the Light Brigade, rides between the opposing forces whose verbal cannon on left and right volley and thunder against it. It seeks in substance a declaratory judgment defining its position with the plaintiffs on one side, and with the union on the other. The case is complicated by the fact that the dispute between the Journal and the defendant union was submitted to arbitration to which plaintiffs were not parties, and an award was rendered favoring the defendant union.

We turn to the transcript, consisting of 950 pages, and the exhibits, half a hundred in number. We shall, for brevity, employ the word "plaintiffs" as including not only the six men named in the title as plaintiffs, but also the 63 other similarly situated, who are represented by the six named persons.

The American Guild, sometimes called the International, is a trade union under charter from the C.I.O., and is the parent organization of the Portland Guild. Robert Abramson is a representative of the American Guild, and at the request of the Portland Guild, has acted as their representative in negotiations with the Journal.

The contract of 30 November 1951 with its amendments is in evidence. It is a collective bargaining agreement between the Portland Guild and the Journal, and it reads, in part, as follows:

"This Agreement, made and entered into this 30th day of November, 1951, between the JOURNAL PUBLISHING COMPANY, hereinafter referred to as the Publisher, and the PORTLAND NEWSPAPER GUILD, a local chartered by the American Newspaper Guild, hereinafter referred to as the Guild for itself *and on behalf of all the employes in the following unit* within the Circulation Depart-

ment of the Publisher, except those excluded from this agreement, WITNESSETH:

"That the parties hereto have agreed as follows:

"The unit shall consist of all *regular employes* in the Circulation Department specifically including City District Managers, Suburban and Country District Managers, Junior District Managers, Portland Dealermen and inside office workers in the Circulation Department, but excluding the Circulation Manager, City Circulation Manager, Home Delivery Manager, Supervisors, Circulation Promotion Manager, Country Circulation Manager, Assistant Country Circulation Manager, head of Dealer Department, Office Manager, Confidential Secretary to the Circulation Manager, Extra, Temporary and Part-time employes, including solicitors, all circulation employes who work outside the corporate limits of the city of Portland with the exception of Suburban and Country District Managers and Junior District Managers and members of all craft unions contemporaneously active in the plant of the Publisher." (Italics ours.)

The contract then provides for continued membership in the Guild as a condition of continued employment, salary schedules, classifications, hours of labor, dismissals, dismissal pay, vacations, and the like. The contract also provides for a "Grievance Committee" and sets forth the procedure for "Adjustment of Disputes" by arbitration.

Chronologically, the first event of importance is the collective bargaining agreement between the Portland Guild and the Journal, but logically, in the consideration of the issues of this suit, we must commence with the facts on which the plaintiffs base their claim for relief. Prior to the execution of the wholesale dealers agreements between the plaintiffs and the Journal, the plaintiffs had been employees of the

Journal, and some of them had been covered by the collective bargaining agreement. In the fall of 1952 some of the employees approached the Journal and requested "buyer-seller contracts" under which they would buy newspapers from the Journal and resell to carrier boys and retail dealers. At different times, but subsequent to 1 October 1952, all of the plaintiffs had signed wholesale dealer agreements with the Journal. The negotiations between the 69 plaintiffs and the Journal took place while many of them were still employees of the Journal, but as a part of the negotiations it was understood and agreed that they could not be both employees and independent contractors at the same time, and as a part of the transaction every one of the 69 who was an employee tendered to the Journal his resignation from the job which he held prior to the consummation of the wholesale dealer agreement.

The evidence establishes that the initiative in securing the wholesale dealer contracts was that of the plaintiffs and not that of the Journal. Eighteen of the plaintiffs executed dealer contracts during the last three months of 1952, and the rest of them executed such contracts on or before 1 January 1954. Prior to July 1952 there had been a number of changes in status whereby Town Manager employees had been changed to Town Manager dealerships on a buyer and seller basis. No objection was registered by the defendants to these early changes in status. In December 1952 a meeting of the Guild was held in which inquiry was made of some of the plaintiffs as to what they thought of their contract dealerships. The plaintiffs expressed their liking for the dealerships and discussion was had as to the attitude of the Guild toward the plaintiffs' dealerships and a vote was taken "that

the contract dealerships in the country and suburban was to be left alone and the Guild would have no interest in us." There is corroborative testimony by witness Spence, a former official of the Guild and later a supervisor in the Circulation Department, that in 1952 he attended a meeting of the circulation unit of the Guild at which the wholesale dealer contracts were discussed and it was voted by the majority "that insofar as they were concerned that it was all right for the country circulation people to sign those agreements and withdraw from the local guild."

It appears clear that many employees met with management as individuals, representing themselves and not acting as or for the Guild, and earnestly sought. the dealership contracts. They were negotiating, not concerning the terms of employment, but concerning the termination of employment and the creation of a different status. After the country circulation was turned over to the independent dealers, the Portland District Managers and Dealermen voted to request similar dealerships. As a result, by the middle of 1953 the entire wholesale distribution of the Journal in the City of Portland came under the contract system along with the country dealers.

■ Mr. Haines, who represented the Journal, testified as a witness called by the plaintiff that objection to the dealership contracts first came to his attention in December 1952. A meeting was held by Haines and representatives of the Guild. At that meeting representatives of the Guild demanded severance pay for the people who had taken dealership contracts, which would appear to amount to a recognition that they were no longer employees of the Journal. The action of the Portland Guild at the meeting to which we have referred, strongly indicates that as a matter of prac-

tical construction the local parties recognized that the independent dealership agreements were not violative of the collective bargaining agreement. Weight should be accorded to such a practical construction which prevailed between the Portland Guild and the Journal until about the time when the American Guild intervened in the discussion. See *Markham & Callow v. International Woodworkers of America*, 170 Or 517, 135 P2d 727.

There is substantial evidence to the effect that the change from employee status to that of independent dealership has had beneficial results both for the dealers and for the Journal. It was shown that the chief asset of the Journal was its circulation, which was estimated to be worth $6,000,000. Obviously the Journal would not have transferred control of that asset to independent contractors unless it was believed that the change would result in increased circulation. The evidence indicates that the change was of material benefit to the Journal.

The first serious opposition to the dealership contracts began when Mr. Jack Abramson came to Portland in July 1953. He was international representative of the American Newspaper Guild, and at the request of the Portland Newspaper Guild, acted as their representative. On 17 July 1953 Abramson met with Haines, who represented the Journal. From that time on the Guild attempted by persuasion and threats to induce the contract dealers to give up their contracts and return to the status of employees. Abramson insisted that the dealership contracts were "worthless pieces of paper" because in conflict with the collective bargaining agreement between the Guild and the Journal. Letters were written to the wives of the contract dealers in an attempt to make them dissatisfied with their

husbands' contracts. Abramson told plaintiffs that he would see to it that they would be put back on employee status.

In connection with their acts of so-called persuasion, the defendant Portland Guild proceeded to present a "grievance claim" against the Journal, claiming that the dealer contracts were violative of the collective bargaining agreement. The grievance procedure failed to accomplish results, and on 24 August 1953, pursuant to the arbitration provisions of the agreement, the president of the Guild addressed the following statement of complaint to Mr. Haines of the Journal:

"Dear Mr. Haines:

"This will acknowledge your letter of August 19, 1953.

"The complaint of the Portland Newspaper Guild is as follows:

"1. The Journal Publishing company changed the status of City District Managers, suburban and Country District Managers, and the Portland dealermen, by entering into individual contracts with them purportedly making them independent contractors instead of employes. This it did without consulting or negotiating with the Guild, thereby violating the recognition extended to the Guild as collective bargaining agent by the contract between the parties, and thereby violating the NLRA.

"2. The aforesaid change of status per se violated the recognition extended to the Guild as collective bargaining agent under said contract.

"3. The conditions of employment (whether as employe or contractor) of City District Managers, Suburban and Country District Managers, and the Portland dealermen, is in violation of the Guild contract in the following respects:

"a. It does not guarantee the minimums guaranteed by the contract.

"b. It does not provide*d* for vacation, sick leave, hours, holidays, dismissal pay.

"c. It does not provide*d* for expenses.

"4. The relief demanded by the Guild is restoration of the status of the City District Managers, Suburban and Country District Managers, and the Portland Dealermen, as employes under the terms and conditions provided by said contract; an accounting of all sums paid to City District Managers, Suburban and Country District Managers, and the Portland Dealermen, since November 1, 1952; payment to City District Managers, Suburban and Country District Managers, and the Portland Dealermen of any difference between moneys shown to have been paid by them by said accounting, and moneys due under terms and conditions of said contract."

> "Sincerely yours,
> "JOHN A. ARMSTRONG
> "President."

This letter, stating the complaint on which arbitration was to be had, itself recognized the agreements with plaintiffs as "purportedly making them independent contractors." But the letter goes further in recognition of the independent contractorships. Complaint is made that plaintiffs' contracts do not provide for vacation, sick leave, hours, holidays, etc. which are characteristic of the employer-employee relationship, and finally, the letter demands the "restoration * * * as employes" of the plaintiffs. Defendants cannot now say that they were not challenging the right of the Journal to change from employee status to that of independent contractor in the method of disposing of their product. That change appears to be at the root of the controversy.

The Portland Guild and the Journal then agreed to a submission of the dispute to arbitration. A board

was selected and the arbitration was conducted on 24 and 25 September 1953. The board consisted of two representatives of the Guild, two of the Journal and Judge Harold Seering of Seattle, who was selected by mutual agreement. The majority of the board, consisting of Judge Seering, Mr. Wykoff, secretary-treasurer of the Guild, and Mr. Abramson, rendered an award, as follows:

"It is the award of the Board:

"1. That the dispute is arbitrable;

"2. That the Publisher did not have the right to enter into individual buyer-seller contracts with City, Suburban and Country District Managers and Portland Dealermen;

"3. That the Publishers' mode of operation with relation to the named classifications should be restored to the status existing prior to the execution of the Wholesale Dealer agreements, and that individuals now acting as wholesale-Dealers be given preference in such restoration to their former status."

The other members dissented.

On 25 March 1954 the Portland Guild addressed a letter to Mr. William Knight, Publisher of the Journal, setting forth a copy of a resolution adopted by the Guild which reads as follows:

"The text of the motion:

"The executive committee be authorized to call a strike of all the members of the Portland Newspaper Guild employed at the Oregon Journal on a date to be determined by the membership of the Portland Newspaper Guild at a legally called special meeting unless the current controversy with the Journal with respect to the circulation department is settled to the satisfaction of the executive committee."

The letter continued as follows:

"We sincerely hope this letter may help clarify any misunderstanding and may contribute to an early settlement of the dispute resulting from the Oregon Journal's refusal to abide by the arbitration clause of its contract with the Portland Newspaper Guild and recognize the arbitration award of February 23, 1954 by the majority of an arbitration panel presided over by the Hon. Judge Harold Seering of Seattle.

"Mr. Haines asked that we further state the position of the Guild as intended by the membership motion and action. This is:

" 'The Portland newspaper Guild is asking the Oregon Journal to continue to recognize the Journal circulation district managers and dealermen *as employes,* under part 3 of the arbitration award of Feb. 23, 1954; and to continue to recognize the Guild as the collective bargaining representative of these employes and to negotiate the conditions of their employment from that point.' " (Italics ours.)

To this letter the Journal, by Mr. Knight, replied in part, as follows:

"Your letter poses for the Journal the most difficult decision of submitting to a strike, or under threat of strike submitting to the Guild's demand that Paragraph 3 of the Seering award be given full force and effect by the Journal.

"The Journal firmly believes that the award is not valid because:

"(1) It unlawfully enlarges the scope of the collective bargaining contract between the Journal and the Portland Newspaper Guild;

"(2) It professes to conform with law and does not conform with law.

"Therefore, the award should not be binding upon the Company as has been set forth in detail in the dissenting opinion of the Company members of the Arbitration Board.

"However, with the suffering of a strike and its attendant economic loss—not only by the Journal but by the Journal's many loyal employes—as the only alternative to submission under strike threat to the Guild's demands on this issue, we have decided to take a course at this time we otherwise would not take. Consequently, our circulation department will terminate performance by the Journal of the Journal's commitments under the wholesale dealer agreements and will, with all reasonable dispatch, give the holders of individual wholesale dealer contracts preference in restoration to their former status as Journal employes, as provided in Paragraph 3 of the award."

On 27 March the plaintiffs as represented by a committee, having been informed of the threat of strike, wrote the following letter to Mr. Knight of the Journal:

"Dear Mr. Knight:

"The Wholesale Dealers represented by the undersigned committee have been advised of the Portland Newspaper Guild's threat to strike the Journal unless the Journal breaks its contracts with them. The Dealers wish to assure you of their firm belief in your integrity and in the integrity of the Journal and that the Journal will respect its contractual obligations in the future as it has in the past. Nevertheless, we hope that you will not take it amiss if we again state our position as follows:

"1. Our group includes at least sixty Dealers and we are not represented by the Portland Newspaper Guild.

"2. We have binding contracts with the Journal. We are prepared to carry out our obligations and shall expect the Journal to do the same.

"3. If the Journal should permit itself to be coerced by the Guild into breaking the contracts, we want to assure you that you will not have a circulation department adequate to distribute the papers.

"4. The Dealers will not accept employment with the Journal in positions formerly held by them in the circulation department.

"5. If the Guild induces the Journal to breach our contracts, we shall take such legal proceedings as are recommended by our attorneys to enjoin interference with our contracts and to recover damages.

"We realize that the Journal is in an unfortunate position in this case because we know that you want to live up to your contracts. However, we have problems involving the economic future of our families and ourselves as well as the Journal. Pursuant to our contractual relationship with the Journal, we have made commitments that we cannot carry out if the Journal should breach these agreements. We dislike the tone of this letter because it is so much like the ultimatum issued to the Journal by the Portland Newspaper Guild. However, our position is founded in right and justice while that of the Guild is evil and iniquitous."

On 31 March 1954 the plaintiffs filed this suit in the circuit court for Multnomah County to restrain the Journal from breaking its contracts with them and to restrain the defendant Guild from forcing the Journal against its will to break said contracts. The circuit court rendered an opinion to which we will later refer, and granted the requested relief.

Large portions of the briefs are directed to the question as to the arbitrability of the dispute under the provisions of the collective bargaining agreement relative to the "adjustment of disputes" (see supra) and to the validity of the award. At this point, however, we are concerned with the effect if any which the award may have upon the rights of the plaintiffs who were not participants in the arbitration. We are not, at this point, concerned with the effect of the

award upon the rights of the defendants and the Journal.

Before considering whether the legal rights of the 69 plaintiffs could be affected by an award in an arbitration between the defendant Guild and the Journal, we must determine the status of the plaintiffs after they had resigned as employees and had each entered into an independent dealership contract with the Journal. The first matter for consideration is the contract itself.

The Dealer contracts specifically provide for the sale and purchase of the Journal's newspapers. The territory within which the dealer is authorized to operate is in each case defined, and the details for carrying out the sale and purchase are set forth in the agreement. From the many stipulations of the contract, we quote the following:

"DEALER AGREEMENT

"SECTION I

"JOURNAL AGREES:

"1. To sell to the Dealer on each day of publication, sufficient copies of Journal's daily newspaper, The Oregon Journal, and Journal's Sunday Newspaper, The Sunday Journal, hereafter collectively called 'The Oregon Journal', for his territory at the wholesale rate fixed by Journal.

* * * * *

"3. To exercise no control or direction over the manner or means of performing any of the functions which the Dealer shall perform under this agreement, or over the methods which the Dealer shall employ in effecting results.

* * * * *

"7. To credit the Dealer with interest on his Advance Payment Account, when the required

amount has been paid, at 2% interest payable semi-annually on January 1 and July 1, but such interest shall cease 50 days after the termination of this agreement.

\*   \*   \*   \*   \*

## "SECTION II

"THE DEALER AGREES:

"1. To sell and deliver copies of The Oregon Journal only in that part of ——————— County/Counties, State of ——————, designated by Journal as territory number or in such other territory as may hereafter be mutually agreed upon in writing by the parties hereto, on form A provided for that purpose.

"2. To use his earnest and conscientious effort to promote and increase the circulation of The Oregon Journal in the territory herein designated and at frequent intervals to thoroughly canvass such territory for the purpose of maintaining a continually increasing volume of sales of The Oregon Journal.

\*   \*   \*   \*   \*

"10. To furnish a substitute to perform the delivery obligation under this agreement whenever necessary, and to be responsible for his own accounts and for those of his substitute, employees, subordinates or subcontractors during the existence of this agreement.

"11. To pay to Journal at its office on or before the ——— day of each ——————— for all newspapers supplied to the Dealer by Journal during the previous ———————. The Dealer to make all collections from all subscribers and customers.

"12. To now pay to The Journal the sum of $——— as an advance payment for papers and supplies, and each ——————— to make further payment of $——— until he shall have paid to

Journal as advance payment for papers and supplies a total amount equal to an average ————— weekly or monthly bill.

\* \* \* \* \*

"BOTH PARTIES AGREE:

"1. *The Dealer is not an employee of Journal, but is an independent contractor operating on a buyer and seller relationship. The Dealer shall be personally responsible for and pay all persons assisting him in the sale and distribution of newspapers and in the collection of money.* [Italics ours.]

\* \* \* \* \*

"3. Journal may, without notice, suspend this agreement in case of strike, fire, flood, earthquake, riot, war or for any other cause beyond the control of Journal.

"4. Either party shall have the right to cancel this agreement at any time on 30 days' written notice to the other of its intention to do so. \* \* \*

\* \* \* \* \*

"JOURNAL PUBLISHING COMPANY

"By ————————————————————

"————————————————————————
(Dealer)

"————————————————————————
(Dealer's Address)"

Attached to the contract form was a form to be signed by guarantors, undertaking faithful performance by the Dealer. Also attached was a form of notice of cancellation effective in 30 days to be used by any Dealer desiring to terminate the contract.

■ The evidence, in our opinion, conclusively established the plaintiffs as independent contractors. Their

resignations as employees from the jobs previously held terminated the relation of master and servant. *Bowser v. State Indus. Acc. Comm.*, 182 Or 42, 185 P2d 891; *Brothers v. State Industrial Acc. Com.*, 139 Or 658, 12 P2d 302; *Landberg v. State Industrial Acc. Com.*, 107 Or 498, 275 P 594; *Scales v. First State Bank*, 88 Or 490, 172 P 499; *Oregon Fisheries Co. v. Elmore Packing Co.*, 69 Or 340, 138 P 862; *Adams Dairy Co. v. Dairy Employers' Union, Local 207*, 363 Mo 182, 250 SW2d 481; 56 CJS 41, Master and Servant, § 3; Hearst Publishing Co., Inc., 102 NLRB No. 21, 31 LRRM 1276; Carter Publications, Inc., 100 NLRB No. 98, 30 LRRM 1318; Hearst Consolidated Publications, 83 NLRB No. 4, 24 LRRM 1013; Kansas City Star Co., 76 NLRB No. 52, page 384. It is of interest to note that the status of plaintiffs as independent contractors was not seriously contested. From the opinion of Judge Seering which accompanied the award in the arbitration proceedings, we quote:

"The Guild does not put in issue the status of the 'Wholesale Dealer' agreements, i.e., whether as a matter of law they do constitute independent contractor agreements. Neither is the question of bad faith raised. The Guild bases its case squarely on the recognition clause and asserts that the action in question was a violation of the Publisher's duty to deal with the Guild as the recognized bargaining agent for the employes in question."

The collective bargaining agreement refers to the rights and obligations of employees not less than 45 times. It covers such matters as the time and amount of payment of salaries and wages. Article II, § 7 of the agreement provides that "Nothing in this agreement shall prevent employes from bargaining individually for pay increases in excess of the minimums

established herein." And the constitution of the American Guild contains the following provision:

"A member may negotiate with his employer individually in his own behalf, but such independent negotiations shall not have the authority or support of the ANG or any branch. Article XIX, § 10."

Other clauses of the collective bargaining agreement provide for payment of overtime, hours of labor, vacations, holidays, dismissal pay, and the like; provisions which clearly apply only to employees and not to independent contractors.

The arbitrator reasons in effect that it is immaterial whether plaintiffs are or are not independent contractors since the Guild bases its case on what he calls the recognition clause of the collective agreement of 30 November 1951 which is set forth verbatim supra. Reference thereto shows that the Portland Guild for itself "and on behalf of *all the employes* in the following unit * * * have agreed." (Italics ours.) Article I of the agreement refers to "All employes covered by this contract * * *."

Neither the arbitrator nor the defendants can sweep aside as immaterial the fact that plaintiffs were independent contractors. As we shall presently demonstrate, it is one of the traditional and fundamental rights of management to decide for itself whether to perform its functions by employees or by independent contracts; a right to be waived, if at all, only by express agreement. The so-called recognition clause must mean one of two things; either (1) it means that the union is authorized to represent those who shall at any time be employees, or (2) it means that all jobs held by employees at the time of the execution of the collective agreement must always be held by employees and that the Journal has agreed not only to the repre-

sentation by the union of its employees, but also that it impliedly has yielded up the prime prerogative of management and frozen its system of doing business. This latter construction is, in our opinion, preposterous. The parties did not agree or intend to agree that all work done by all the employees holding the jobs designated in the so-called recognition clause shall continue to be done by employees. The practical construction originally followed by the union negatives any such intent on its part. See *Kontz v. B. P. John Furniture Corp.*, 167 Or 187, 115 P2d 319.

Our present inquiry is whether the independent contracts executed by plaintiffs and by the Journal were valid when made, bearing in mind that there was in existence at that time a collective bargaining agreement between the Portland Guild and the Journal, but remembering also that the plaintiffs' contracts antedated the arbitration.

The authorities cited by the plaintiffs and by the Journal fully support the proposition that so far as the Journal was concerned it had a legal right to change its method of doing business by entering into agreements with the independent contractors whereby the Journal sold its product, to wit, newspapers, to the plaintiffs instead of distributing them to the public by its own employees. Neither union recognition by itself nor the National Labor Relations Act is restrictive of this right of management.

In *Paul v. Mencher*, 7 NYS2d 821, the plaintiff brought suit to enjoin union picketing. Plaintiff had elected to discontinue a factory which he had previously operated, with the resultant discharge of some employees, followed by picketing. The court said:

"Judgment for plaintiff. There is no labor dispute as defined by statute between the parties

hereto. It is the prerogative of any business man, with or without reason, to continue or discontinue his business, to change, alter or modify the nature of his business as he sees fit without necessity of explanation or excuse to anyone. When the plaintiff elected to discontinue his factory no one was privileged to complain even though it was done deliberately to avoid a labor dispute."

This case goes even beyond the ruling which we are asked to make. In the pending case there was no evidence or claim of bad faith on the part of the Journal. Its action was not done for the purpose of avoiding a labor dispute but was done in good faith at the request of plaintiffs and for the improvement of the circulation of the newspaper.

In *Adams Dairy Co. v. Dairy Employees' Union*, supra, 363 Mo 182, 250 SW2d 481, the plaintiff brought suit to restrain the union from striking and picketing the plaintiff's plant. Defendants by cross bill asked the court to enjoin the plaintiff from violating its labor contract with the union. The facts were as follows: Plaintiff dairy delivered milk to its customers by means of trucks driven by plaintiff's employees, who were members of the union. Plaintiff had signed a collective bargaining agreement with the union concerning the employment and working conditions of the employees. Plaintiff desired to discontinue delivery of milk and to sell it at the plant. The parties negotiated but failed to agree, and no provision on the subject was made in the collective bargaining agreement. Thereafter the plaintiff sold its trucks and entered into contracts with the purchasers who bought the milk and sold it to retailers. Defendants threatened strike and picketing, and plaintiff brought the suit for injunction. The trial court enjoined the defendants, and on appeal its action was affirmed. The court said, "If the

owners of these trucks are independent contractors * * * then * * * the plaintiff did not violate the labor contract with defendant union." After a full and important discussion of the cases, it was held that the truckmen were independent contractors. The court then referred to Articles 2 and 9 of the collective bargaining agreement on which the defendants relied. Article 2 provided, in part, that "it is mutually agreed any major changes in the present working conditions or rules must be mutually agreed to by the Union, employees and employer * * *." Concerning this the court said:

"The change-over from delivering milk by truck to the sale of the milk at plaintiff's plant to independent contractors was not a change 'in the present working conditions or rules' as contemplated by the labor contract. The working conditions or rules governing the employees of plaintiff were not changed on iota. True, the change resulted in the discontinuance of six positions held by members of defendant Union, but that is not a change in working conditions. Thompson v. Boekhout, 273 NY 390, 7 N.E.2d 674. * * * To constitute a labor dispute, there must be a controversy over conditions or terms of employment. In this case, plaintiff abandoned a part of its activities, that of delivering milk, which it had a right to do. It could have sold its entire business without consulting the Union. * * *

"Since the action of plaintiff in discontinuing the delivery of milk was not within the scope of the labor contract, the Union was not authorized to picket or to strike and, it follows, the threatened strike and picketing were unlawful. Defendants conceded that picketing or striking for an unlawful purpose may be prevented by injunction. Empire Storage & Ice. Co. v. Giboney, 357 Mo. 671, 210 S.W.2d 55; Giboney v. Empire Storage & Ice Co.,

336 U.S. 490, 69 S.Ct. 684, 93 L.Ed. 834; 43 C.J.S., Injunctions, § 138(a), page 686."

In answer to defendants' claim that there was a legitimate dispute because the services of truck drivers who were members of the union had been dispensed with, the court pointed out that the truck drivers voluntarily accepted the new positions and were satisfied. Article 9 of the agreement was as follows:

"The Employer agrees that no employee will be requested to make any contract either written or verbal which may conflict with this Agreement."

Concerning this, the court said:

"The evidence disclosed that when it was learned that plaintiff had offered its trucks for sale and was going to discontinue delivering milk, a number of truck drivers purchased trucks and each signed a contract with plaintiff to purchase milk as above-related. The signing of such a contract was not a violation of Article 9. This article forbids any member of the Union to sign 'any contract' which would be inconsistent with the labor contract negotiated and signed by the Union on behalf of the Union members. The contracts which were signed did not pertain to conditions of labor and no provision thereof conflicted with or changed the labor contract in any respect. The point must be ruled against defendants."

In *Application of Berger*, 78 NYS2d 528, the controversy concerned the abandonment by the World Broadcasting System of one department of the business and the adoption of an independent contractor system in lieu of the work formerly done by employees. The union contended that the employees were laid off or discharged, thus constituting a labor dispute within the terms of the collective agreement, and that the dispute was arbitrable. They therefore instituted pro-

ceedings to compel arbitration. The collective agreement provided that "any grievances or disputes between World and Union" should be submitted to arbitration if they were not settled by "grievance procedure." The court said:

"The court must not be understood to hold that if the employer's good faith were put in issue by facts, as distinguished from unsupported charges, a case for arbitration might not be made out. All the court holds is that on this record the union has not met the employer's statement by any proof which creates an issue either on what the employer has done or on its good faith in doing so. The petitioner does not show that there was a layoff or discharge in the sense in which these terms were used in the agreement, nor that the employees in the discontinued department were released in a discriminatory or other manner contrary to the provisions of the collective agreement.

"In final analysis the petitioner's position is a challenge of the employer's right to discontinue the department in the absence of attack on its good faith. The parties have not by the collective agreement committed the power to dispose of such a controversy to an arbitrator.

"It is settled that unless a dispute is, by the terms or fair implication of a collective agreement, within the scope of an arbitration clause, there is no right to have the dispute arbitrated."

In *National Labor Relations Board v. Houston Chronicle Publishing Co.*, 5th Circuit, 211 F2d 848, the issue was almost identical to that with which we are concerned. The Chronicle discontinued its method of delivering its newspapers by its own employees and instituted an independent contractor system. The National Labor Relations Board held that the Chronicle had violated the Labor Relations Act in that it had abridged the employees' right to bargain collectively,

and that it had discriminated in employment for the purpose of discouraging union membership. The board petitioned the court for enforcement of its order which had directed the Chronicle to reestablish the district manager system of city circulation and reinstate the independent contractors as employees, and to bargain collectively with the Newspaper Guild. The United States Court of Appeals denied the petition. The board conceded "that respondent [the Chronicle] may suspend its operations or change its business methods so long as respondent's change in operations is not motivated by the illegal intention to avoid its obligations under the act." (See other cases cited.) The court held that "the issue is not whether the business reasons advanced by the respondent were good or bad, but whether the respondent actually in good faith had business motives for the change * * *." It found no satisfactory proof of illegal motives and held that the Chronicle was not guilty of unfair labor practices, and refused to grant the enforcement order. The court said that the services of the employees were validly terminated when the respondent in the exercise of its business judgment instituted the independent contractor system of distribution. This case is a direct authority for the position taken by the plaintiffs herein. It goes beyond the issue here involved. In the case of the Chronicle the employer dismissed employees and let the delivery work to independent contractors. But in the case at bar no employees were dismissed. At their own urgent request the employees sought the independent contractor status and voluntarily resigned as employees as a part of the transaction. Again, in the Chronicle case there was an issue raised as to whether the change from employee to contractor was illegally motivated "in order to defeat the employees'

exercise of their organizational rights and to avoid its obligation to bargain with the union." The court ruled that there was no illegal motivation proven, but in the pending case there is not even a claim of such illegal motivation.

The following cases indicate that the contracts between the plaintiffs and the Journal were not violative of the National Labor Relations Law: In the case of *The Dispatch Printing Company, Inc., Ohio State Journal Division and Columbus Newspaper Guild, CIO, Petitioner*, which appears in 93 NLRB No. 215, page 1282, the petitioning union sought to represent a unit of all employees in the circulation department of the Ohio State Journal, with certain exceptions. The question was what persons should by order of the National Labor Relations Board be included in the unit. Those who were employees on salary were so included. Among the groups considered by the Board were the suburban route operators, truck drivers, city independent haulers, and some others. Of the suburban route operators, the Board said, they "buy the papers at an agreed rate below the selling price to customers. The difference constitutes their earnings. The Employer guarantees them a minimum return equivalent to 10 cents per route mile. They are not carried on the Employer's payroll, but are paid by expense check, from which no payroll deductions are made." The Board held that certain groups of employees constituted a unit appropriate for the purposes of collective bargaining within the statute, but excluded from the unit the suburban route operators, truck drivers and others.

In Florida Builders, Inc., 111 NLRB No. 130, page 786, a trial examiner found that the Florida Builders had engaged in unfair labor practices and

recommended the issuance of a cease and desist order. Respondents excepted to the order and the National Labor Board found merit in the exceptions. Three employees who had signed cards authorizing the union to act as their bargaining representative had been dismissed from their employment when their employer, in accordance with some previous practice contracted out their work to an independent contractor. The Board found no discriminatory practice was involved in this action. A similar ruling under similar conditions was made in National Gas Co., 99 NLRB No. 44, page 273. See also, Celanese Corporation of America, 95 NLRB No. 83, page 664, and Acme Air Appliance, 10 NLRB No. 123, page 1385.

In *Martel Mills Corp. v. National Labor Relations Board*, 114 F2d 624, the company petitioned the Federal Court to review an adverse ruling of the Board which had held that the company had been guilty of unfair labor practices in dismissing certain employees. (Another case of dismissal—not resignation.) The dismissal was by reason of economic considerations. The court said:

> " 'The National Labor Relations Act was not intended to empower the Board to substitute its judgment for that of the employer in the conduct of his business. It did not deprive the employer of the right to select or dismiss his employees for any cause except where the employee was actually discriminated against because of his union activities or affiliation. * * * *The Act does not vest in the Board managerial authority.'* * * *
>
> "Under a system of free enterprise, amended by a statute which seeks to attain an equality of contract and of justice through the protection of the employees' right to bargain collectively, we must not destroy those liberties which are distinctive to our type of economy. * * * Where economic con-

siderations necessitate a contraction in the employer's labor force, the employer, in deciding which employees are to be retained, must be free to choose from the more capable and the more worthy. * * *"

To the same effect see *National Labor Relations Board v. Union Pacific Stages*, 99 F2d 153.

In J. J. Stanton, 35 National Labor Relations Board No. 202, page 1100, the Board said at page 1108:

"* * * The undisputed evidence shows that on February 28, 1940, the respondent entered into a contract with an independent contractor for the performance of work which these employees had previously been doing. The issue of the respondent's good faith in entering into the contract was not raised or litigated and is consequently not before us. * * *."

The principle stated is applicable in the case at bar. See also, *Local Union No. 600 v. Ford Motor Co.*, 113 FSupp 834; *Machine Printers Beneficial Ass'n v. Merrill Textile Print Works*, 12 NJ Super 26, 78 A2d 834; *B. F. Curry, Inc. v. Reddeck*, 86 NYS2d 674.

We think the cases above mentioned and others cited by the respondents establish that the independent contracts with the plaintiffs when made were valid and were not then violative of any provision of the collective bargaining agreement which had been previously executed.

In *J. I. Case Co. v. Labor Board*, 321 US 332, 88 L Ed 762, later to be discussed, the court said:

"* * * Collective bargaining between employer and the representatives of a unit, usually a union, results in an accord as to terms which will govern hiring and work and pay in that unit. The result is not, however, a contract of employment except in rare cases; no one has a job by reason of it and

no obligation to any individual ordinarily comes into existence from it alone. The negotiations between union and management result in what often has been called a trade agreement, rather than in a contract of employment. * * *"

Again, the court said:

"After the collective trade agreement is made, the individuals who shall benefit by it are identified by individual hirings. The employer, except as restricted by the collective agreement itself and except that he must engage in no unfair labor practice or discrimination, is free to select those he will employ or discharge. * * *"

The judicial definition of a collective bargaining agreement on its face indicates that it does not restrict the right of management to deal with independent contractors as was done in the pending case.

"The broad definition of 'collective bargaining' * * * is an agreement between an employer and a labor union which regulates terms and conditions of employment, with reference to hours of labor, wages, and deals also with strikes, lockouts, walkouts, arbitration, shop conditions, safety devices, the enforceability and interpretation of such agreement and of numerous other relations existing *between employer and employee.* Railway Mail Ass'n v. Murphy, 44 N.Y.S.2d 601, 605, 608, 180 Misc. 868," (Italics ours.)

Such agreements relate to general conditions incident to employment or to the freedom of choice of employees in selecting their bargaining representative. *Labor Relations Board v. American Rolling Mill Co.*, 126 F2d 38 at 41; *National Labor Relations Board v. Boso Mfg. Co.*, 118 F2d 187. In the absence of a clear and specific provision, a collective bargaining agreement should not be construed as a contract of continued employment as to any employee.

In *Amalgamated Association, Etc. v. Greyhound Corp.*, 231 F2d 585, the court said:

"The sole question presented by this appeal is whether under the collective bargaining agreement entered into between the parties the employer has the right to lay off a group of janitorial employees covered by the agreement and hire the services of an independent contractor in their place.  *  *  *"

The facts were that the employer laid off certain employees and entered into an agreement with an independent contractor to do the work previously performed by the discharged employees. The union threatened to call a strike if the employees were laid off. The company sued for a declaratory judgment under the collective bargaining agreement. In that agreement there was neither an explicit provision stating that the employer might reduce his forces nor a provision stating under what conditions it might be done. As the court said, "The agreement is silent on the precise question in issue." The court then reviewed the authorities and found that "In prior rulings on the question, the cases are heavily on management's side." The court agreed that a "broadly-phrased management prerogatives section" would strengthen the company's position, but added:

"we cannot concede that the absence of such a provision would work a different result. So to hold would be to find an implied term in every collective bargaining agreement that employees have inherent rights to retain their jobs, except where the contrary is expressly provided for.  *  *  *"

In a well-reasoned opinion, the court concluded as follows:

"Therefore, the union's interpretation of the contract cannot be supported by reference to its express terms or any reasonable implications there-

from, nor can we accept any theory that there are inherent rights possessed by employer or employees outside the common law and statute and antedating the negotiation of any contractual provision on the question. We must conclude that if the parties intended to create any rights in the event of a contracting out of part of the business, as, for example, they did with regard to the rental of buses, they would have included a provision on that subject in the agreement. In the absence of such a term, we must regard the company's contract with Floors, Inc. as no breach of its collective bargaining agreement with the union."

To the same effect, see *Dairy Workers v. Detroit Creamery Co.*, 38 Labor Relations Reference Manual 2303, 2304, where the court said:

"The mere signing of a collective bargaining agreement does not deprive the company of its normal rights of management, and no intention to yield or impair such inherent managerial functions, including the right to subcontract, can be implied by such signing. Management may, if it chooses, restrict its freedom of action in this field, but its intention to yield its inherent prerogatives must be found in the agreement."

Despite the strong preponderance of the judicial decisions favoring the right to make independent contracts, the unions ask us to follow a line of decisions in arbitration proceedings. The question now under consideration concerning the right of the Journal to contract with plaintiffs is a judicial question and court decisions must be given the greater weight. Furthermore, many of the arbitration cases are clearly distinguishable. In the following arbitration awards cited by the defendant unions, the issue involved questions of changes in employer-employee relations rather than the termination of that relation and substitution of independent contractors: Bethlehem Steel Co., 16

Labor Arbitration Reports 111; Lukens Steel Co., 20 LA 604; Cooperative Mills, Inc., 20 LA 603; North American Aviation Co., Inc., 17 LA 692; Aleo Mfg. Co., 15 LA 715; Celanese Corp. of America, 14 LA 31; Volco Brass & Copper Co., 11 LA 1154; New Britain Machine Co., 8 LA 720; Kuehne Chemical Co., 23 War Labor Rep 294; Pacific Mills, 2 LA 545; *Medo Photo Supply v. NLRB*, 321 US 678. These cases are not controlling.

*Mencher v. B. Geller & Sons*, 93 NYS2d 886, is distinguished by the fact that there were express limitations in the bargaining agreement on the powers of management. National Tube Company, 17 LA 790 is not directly in point, but it contains language contrary to the rule set forth in the court decisions. To that extent we reject it as authority. We reject the conclusions reached in Magnolia Petroleum Co., 21 LA 267 as being contrary to the clear weight of authority.

■ We have quoted at length and with approval from *J. I. Case Co. v. Labor Board* on one point. We now point out that it is distinguishable on its face from the case at bar and does not support the proposition for which it is cited by the defendants. That case, like those cited in the Labor Arbitration Reports (LA) did not involve the resignation of employees and the making of independent contracts with them. The question in *J. I. Case v. Labor Board* related to the making of individual contracts of employment with regular employees in derogation of the provisions of the collective bargaining agreement. The court said:

"* * * We know of nothing to prevent the employee's, because he is an employee, making any contract provided it is not inconsistent with a collective agreement or does not amount to or result from or is not part of an unfair labor practice. But in so doing the employer may not incidentally

exact or obtain any diminution of his own obligation or any increase of those of employees in the matters covered by collective agreement." *J. I. Case Co. v. Labor Board*, 321 US 332 at 339.

Our holding is that the contract made with the plaintiffs herein was not inconsistent with the collective bargaining agreement and did not involve any unfair labor practice.

If the Journal under the collective bargaining agreement was free to contract with the plaintiffs, the same conclusion is even more clear when considered from the standpoint of the plaintiffs. We have pointed out that the agreement with the union and the constitution of the American Guild expressly permitted employees to bargain individually, though they could not by doing so have the support of the Union, nor could they thereby impair the rights given in the collective agreement. But the collective agreement in its essential nature relates to the terms and conditions of employment. The plaintiffs were not bargaining concerning terms and conditions of employment. They were proposing to terminate their own employment and asking the Journal to terminate it and to create a new status, that of independent contractors.

The collective agreement considered as a whole demonstrates that its purview is limited to those who are employees, which plaintiffs were not. Any other construction would amount to the imposition by implication of limits upon the traditional and judicially established rights inherent in management. If such a limitation upon such rights is to be made, the way to make it is to say so in clear and explicit language in the agreement. This the agreement does not do. The unions had no more right to insist that the Journal should refrain from selling its product wholesale to

independent contractors than it would to demand that a cash and carry butcher shop should peddle its products from door-to-door by its own employees.

■ In the solution of the ultimate problem in this case we must return to some fundamental principles of tort law. The plaintiffs have valuable contracts with the Journal, in reliance on which they have quit their former employment and invested substantial sums of money. The defendants threaten to call out the employees of the Journal on strike unless the Journal terminates its legitimate business relations with the plaintiffs and reinstates the plaintiffs against their will as employees. Coerced by the threat of a strike, the Journal informs the defendant union that it will yield to duress and will "terminate performance by the Journal of the Journal's commitments under the wholesale dealer agreements." The public is not without interest in such a procedure. In the Restatement of Contracts, it is said: "A bargain, the making or performance of which involves breach of a contract with a third person, is illegal." Section 576. The general principle involved is stated in the Restatement of Torts, Section 766, as follows:

> "Except as stated in Section 698, one who, without a privilege to do so, induces or otherwise purposely causes a third person not to
> "(a) perform a contract with another, or
> "(b) enter into or continue a business relation with another
> is liable to the other for the harm caused thereby." 4 Restatement of Torts, § 766, page 49.

The exception relates only to alienation of affections of a person under contract to marry. The conduct of the defendants comes squarely within the scope of the section, the only question being whether they were possessed of a privilege to do that which in the absence

of privilege would be actionable. It may be that if there was a legitimate labor dispute between the Journal and the union, the courts might spell out a privilege or justification which would constitute a defense to a suit or action by the plaintiffs on the theory that the benefit to the Labor Union outweighs the detriment to the plaintiffs, but, as we have held, here there is no labor dispute. The terms and conditions of employment are not involved. We find no justification for coercive tactics by the defendants, the effect of which is first to invade the exclusive functions of management and second to destroy profitable contractual rights of third parties, the plaintiffs.

We accord approval to the enumeration by the Restatement of the factors to be considered in determining the existence of privilege. They are:

"(a) the nature of the actor's conduct,
"(b) the nature of the expectancy with which his conduct interferes,
"(c) the relations between the parties,
"(d) the interest sought to be advanced by the actor and
"(e) the social interests in protecting the expectancy on the one hand and the actor's freedom of action on the other hand." 4 Restatement of Torts, § 767, page 63.

None of the factors persuades us of the existence of any defense available to the defendants here. Applying these general rules to cases involving organized labor, the Restatement defines the privilege of "workers" as follows:

"Workers are privileged intentionally to cause harm to another by concerted action if the object and the means of their concerted action are proper; they are subject to liability to the other for harm so caused if either the object or the means of their concerted action is improper." 4 Restatement of Torts, § 775, page 97.

We have already held that the "object and the means of their concerted action" in this case were not proper because they were not demanding anything which was reasonably related to the terms of employment or to the purposes of collective bargaining. The insistence by the defendants that as between the defendants and the Journal they have a right to employ coercive action in order to compel the Journal to change its managerial policy is doubtful enough, but that is not the controlling issue here. In this case the Portland Guild and the Journal are both defendants in a suit in which the rights of third parties are involved. We do not find the defendants clothed with any privilege based on public policy under the facts of this case.

■ The cases disclose a progressive development of the law concerning tortious interference with contract rights from the decision of *Lumley v. Gye*, 2 El. & Bl. 216, 1 Eng Rul Cas 706 to the present time. Actual malice in the sense of ill will has ceased to be a material element in a cause of action for interference with contract rights. Prosser on Torts, 2d Ed, page 721; *Jaco v. Baker*, 174 Or 191, 148 P2d 938. Again, it is said:

"* * * The subsequent development of the law has extended the principle to interference with advantageous economic relations even where they have not been cemented by contract; and the liability for inducing breach of contract now is regarded as merely one instance of protection against such unjustified interference. * * *" Prosser on Torts, 2d Ed, page 724.

Though cases of the type in question have been few in Oregon, the court has recognized the principle as valid.

In *Phez Co. v. Salem Fruit Union*, 103 Or 514, 201

P 222, 205 P 970, the plaintiff company sued the defendant union and certain growers of loganberries to enforce performance of a contract by which the Fruit Union agreed to deliver the crop of the growers to the plaintiff. The growers had agreed with the Fruit Union to deliver the crop to it. The growers sold their crop to third parties, rendering it impossible for the Union to comply with the contract with the plaintiff. In the opinion on rehearing the court said:

> "If the defendants be regarded as strangers to the contract of sale between the fruit union and plaintiff, as contended by defendants, the complaint is still sufficient as to the defendant growers under the rule that where a stranger wrongfully induces another to commit a breach of contract, or intentionally disables such other from discharging the obligations of his contract, the wrongdoer is liable in damages, or in a proper case may be enjoined from carrying out his wrongful purposes: * * *." Citing many cases.

Our conclusion is that the defendants have, without justification, tortiously threatened to cause irreparable damage to all of the plaintiffs by interfering with the plaintiffs' contract rights, and that unless enjoined they will by the usual methods employed in strikes compel the Journal to terminate its contracts with the plaintiffs, contrary to the wishes of both the plaintiffs and the Journal. Other authorities which tend to support our conclusion are: *Saveall v. Demers*, 322 Mass 70, 76 NE2d 12, 2 ALR2d 1190; *Royal Realty Co. v. Levin*, 244 Minn 288, 69 NW2d 667; *Sweeney v. Stenjem*, 271 Wis 497, 74 NW2d 174; *Knickerbocker Ice Co. v. Gardiner Dairy Co.*, 107 Md 556, 69 A 403; *Doremus v. Hennessy*, 176 Ill 608, 52 NE 924; *Owen v. Williams*, 322 Mass 356, 77 NE2d 318, 9 ALR2d 223; *International Brotherhood v. Hanke*, 339 US 470, 94

L Ed 995; *Kamm v. Flink*, 13 NJL 582, 175 A 62; *Busch & Sons v. Retail Union of New Jersey*, 27 NJSuper 432, 99 A 519.

■ The following cases which hold that when picketing is for an unlawful purpose an injunction may issue are persuasive: *Building Service Employers International Union v. Gazzam*, 339 US 532, 94 L ed 1045; *Hughes v. Superior Court of California in and for the County of Contra Costa*, 339 US 460, 94 L ed 985; *Giboney v. Empire Storage Co.*, 336 US 490, 93 L ed 834. In *Peters v. Central Labor Council*, 179 Or 1, 169 P2d 870, this court said:

"We agree with appellants that picketing, even though peacefully conducted, ought to be enjoined if it is for an unlawful purpose. Ever since the enactment of the Anti-Injunction Act, this court has consistently held that picketing must be for a lawful purpose. Starr v. Laundry Union, 155 Or. 634, 63 P. (2d) 1104; Wallace v. International Ass'n of Mechanics, supra; Schwab v. Moving Picture Operators, 165 Or. 602, 109 P.(2d) 600; Markham & Callow v. International Woodworkers, supra; Stone Logging Co. v. International Woodworkers, 171 Or. 13, 135 P.(2d) 759. There is no decision of the United States Supreme Court to the contrary. The court, in Dorchy v. Kansas, 272 U.S. 306, 71 L.Ed. 248, 47 S.Ct. 86, said: '* * * a strike may be illegal because of its purpose, however orderly the manner in which it is conducted.' It is significant that in those cases where the Supreme Court identified picketing with free speech no unlawful purpose of the picketing was involved. That courts may take into consideration the purpose of the picketing is established by the great weight of authority. See cases collated in note 116 A.L.R. 501. Also see Teller on Labor Disputes, Vol. I, § 114. Some courts, however, refuse to enjoin picketing even if it is for an unlawful purpose. Wilson & Co. v. Birl, 27 F.Supp. 915. In our opinion, the Norris-LaGuardia

Act—which concerns procedural rights—was never intended to make lawful that which was unlawful before its enactment. Neither do we believe that free speech in involved where the labor objective is illegal. R. H. White Co. v. Murphy, 310 Mass. 510, 38 N.E.(2d) 685. Even free speech has its limitations. Carpenters and Joiners Union v. Ritter's Cafe, 315 U.S. 722, 86 L.Ed. 1143, 62 S.Ct. 807."

To the same effect see *State of Oregon ex rel. v. Dobson*, 195 Or 533, 570, 245 P2d 903.

Concerning the recent decisions of the United States Supreme Court, Justice LUSK, speaking for this court, said:

"* * * These cases, it may be said, cast new light on the extent of the identification of picketing with the constitutional right to speak freely as opposed to the correlative right of a state, in the exercise of its reserved powers under the federal system, to regulate picketing in the interest of the public welfare. They definitely establish that picketing may be restrained by a state where it is practiced, even though peacefully, in the pursuit of an objective reasonably deemed by the state to be unlawful, and whether the state policy in that regard be expressed in a statute or judicially declared. * * *" (Citing many cases.) *Gilbertson et al v. Culinary Alliance et al*, 204 Or 326, 282 P2d 632.

■ It was asserted by the defendants that even if the contracts with the plaintiffs were not violative of the collective bargaining agreement when made, they became illegal because the arbitration award of 23 February 1954 operated retroactively upon the plaintiffs' contracts of 1952-1953. In their brief defendants say that that award was "conclusive and res judicata of all questions of law and fact." We reject this contention. We have already held that the validity of plaintiffs' contracts must be determined as of the time and

under the conditions existing when they were made. We reject the idea of retroactivity in view of the clear rule that an arbitration award is not binding on non-participants in the arbitration. Plaintiffs were not participants in the arbitration agreement. In fact, some of them had received withdrawal cards from the union, and others had been expelled or threatened with expulsion. None agreed to submit. None of them were employees of the Journal at the time of the arbitration. The following cases fortify the obvious by holding that an award does not bind non-participants: *Multnomah County v. Willamette T. Co.*, 49 Or 204, 89 P 389; *Dillon v. American Brass Co.*, 60 A2d 661; *Unger v. O'Leary*, 4 LRRM 823. From the O'Leary case we quote the "Digest-Summary of Opinion", as follows:

> "Persons who entered into contracts with the Grandview Dairy Company whereby they bought routes of milk customers and the good will thereof from the company, and the company agreed to deliver milk and milk products to these persons for a specified time, are entitled to a temporary injunction restraining a breach of these contracts in an action against the company and Local 584 of the Milk Wagon Drivers Union, notwithstanding an award of arbitrators that the sale of the routes by the company constituted a breach of its previously executed contract with the union, where the persons to whom the company sold the routes were not parties to the arbitration proceedings and are 'in no way bound by the arbitration proceedings.'"

See also, *Carpenter's Union v. Citizens Committee*, 333 Ill 225, 164 NE 393, and 3 Am Jur 878, Arbitration and Award, § 47.

In the case at bar there were in existence valid contracts between the respective plaintiffs and the Journal. Thereafter the defendants could not, while those contracts were still in force, legally coerce the

Journal into an agreement to violate them. How then could they legally coerce the Journal into violating the contracts by securing an agreement that the Journal would violate plaintiffs' contracts if directed to do so by an arbitrator who derived his authority solely from the defendants and the Journal? We have intimated that the dispute between the Journal and the defendants as to the right of the Journal to enter into independent contracts with the plaintiffs did not concern the terms and conditions of employment and was not within the purview of the collective bargaining agreement. It was not arbitrable under that agreement and the arbitrator erred in holding the contrary. *Local Union No. 600 v. Ford Motor Co.*; *Machine Printers Beneficial Ass'n v. Merrill Textile Print Works*, and *B. F. Curry, Inc. v. Reddeck*, all supra. It necessarily follows that the arbitrator would not by virtue of that agreement acquire jurisdiction to decide the dispute beyond the power of judicial review even between the Journal and the defendants, much less between the defendants and the non-participating plaintiffs. *Roberts v. Criss*, 266 F 296. But the defendants argue that a representative of the Journal made some statements before the arbitrator which amounted to an agreement that the decision of the arbitrator as to the arbitrability of the dispute under the collective bargaining agreement, that is, the decision as to his own jurisdiction, should be final in the sense that it would be beyond judicial review even though the jurisdictional question was purely a question of law.

If, as defendants contend (but the Journal denies), there was such an agreement as would bar this court from reviewing the decision as to arbitrability, the legal effect upon the plaintiffs would be just the same as if the Journal without any arbitration had yielded

to the coercion of the defendants and agreed to violate the plaintiffs' contracts. Such an agreement could not affect the rights of the plaintiffs.

■ The general rule is that an arbitrator derives his authority solely from the submission agreement of the parties, and the extent of his authority is normally a question of law which is reviewable by the courts. 3 Am Jur 932, Arbitration and Award, § 106; 6 CJS 219, Arbitration and Award, § 80; *Lehigh Coal & Navigation Co. v. Central R. of New Jersey*, 33 FSupp 362; *Finsilver, Still & Moss, Inc. v. Goldberg, Maas & Co., Inc.*, 253 NY 382, 171 NE 579; *Pumphrey v. Pumphrey*, 172 Md 323, 191 A 235.

■ It is also the rule that an agreement that an arbitrator shall be the final judge of his own jurisdiction must be clear and unequivocal before it will be given effect. *D. B. Fernandez and Hnos., S. En. C. v. Rickert Rice Mills, Inc.*, 119 F2d 809; *Simons v. Publishers' Association of New York City*, 94 NYS2d 362; *Finsilver, Still & Moss, Inc. v. Goldberg, Maas & Co., Inc.*, supra; *Pumphrey v. Pumphrey*, supra; *Texoma Natural Gas Co. v. Oil Workers U.U.*, 58 FSupp 132; *Rueda v. Union Pacific R. R. Co.*, 180 Or 133, 175 P2d 778; *Hooper v. Pennick*, 102 Or 382, 202 P 743; *Mutual Benefit Health and Accident Association v. United Casualty Co.*, 142 F2d 390; 3 Am Jur 955, Arbitration and Award, § 132; 3 Am Jur 868, Arbitration and Award, § 41; 17 U of Chi L Rev 616.

If the rights of the plaintiffs were not involved, and if the litigation was only between the Journal and the defendants, it might be necessary to pass upon the difficult question as to whether the Journal in the arbitration proceedings bound itself to abide by the decision of the arbitrator as to his own jurisdiction, but as set forth in the Restatement of Contracts, § 576,

"A bargain, the making or performance of which involves breach of a contract with a third person, is illegal." The Journal and the defendants could not stipulate away rights of the plaintiffs.

The issues herein were made up by a complaint filed by plaintiffs, a cross complaint by the Journal, demurrers by the defendants to both, which demurrers were overruled, and a general denial by the defendants of both the complaint and cross complaint. We have considered the contentions presented by the plaintiffs and find in their favor. The cross complaint of the Journal is in the nature of a prayer for a declaration of rights. It pleads its belief that the plaintiffs' contracts are valid and asks a declaration (1) whether its contracts with the plaintiffs are valid, (2) whether the collective bargaining agreement prohibited the Journal from making those contracts, and (3) that if the contracts with plaintiffs are valid the defendants be enjoined from coercing the Journal to terminate them. The decision of this court upon the issues made by the plaintiffs' complaint also disposes of the questions above mentioned as presented in the cross complaint. The other prayer in the cross complaint is conditional. It asks that if the court holds that the collective bargaining agreement rendered the contracts with the plaintiffs illegal, the court should enjoin the plaintiffs from instituting actions against the Journal. In view of our decision that plaintiffs' contracts were legal, the prayer for relief against the plaintiffs becomes immaterial.

The decree of the circuit court is affirmed.

Kester, J. resigned before this decision was rendered.

Sloan, J. did not participate in the consideration of this case.