280 F.2d 665
 INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN & HELPERS OF AMERICA, LOCAL UNION NO. 310, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
Shamrock Dairy, Inc., Intervenor.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
SHAMROCK DAIRY, INC., Respondent.
 No. 14357.
 No. 14411.
 United States Court of Appeals District of Columbia Circuit.
 June 16, 1960.
 
 Mr. Herbert S. Thatcher, Washington, D. C., was on the pleadings for petitioner in No. 14357.
 Messrs. Thomas J. McDermott, Associate Gen. Counsel, National Labor Relations Board, Marcel Mallet-Prevost, Asst. Gen. Counsel, National Labor Relations Board, and Melvin Pollack, Atty., National Labor Relations Board, were on the pleadings for respondent in No. 14357 and petitioner in No. 14411.
 Messrs. Arthur M. Kuhl, Washington, D. C., Richard G. Kleindienst, Phoenix, Ariz., and Gerard D. Reilly, Washington, D. C., were on the pleadings for intervenor in No. 14357 and respondent in No. 14411.
 Before WILBUR K. MILLER, WASHINGTON and BURGER, Circuit Judges.
 ORDER
 PER CURIAM.
 
 
 1
 These cases came on for hearing and were remanded to the Board for further proceedings and are now before us on the motion of petitioner in case No. 14,357 for modification of the decree of the National Labor Relations Board and for enforcement of the decree as modified, on the opposition of Shamrock Dairy, Inc., of the reply of the Board to the petitioner's motion, on the petitioner's response to the reply of the Board and on the response of Shamrock Dairy, Inc., to the Board's reply.
 
 
 2
 Having considered all the foregoing pleadings, and being of the view that the drivers ceased to be employees and became independent contractors when they signed contracts for distributorship; that the six drivers who did not sign as distributors should not be reinstated because their discharge was the result of a "reduction in force;" and that, although Shamrock Dairy, Inc., technically violated the Act in failing to give the Union an opportunity to discuss the independent distributors' plan, the court concludes that the order of the Board entered in this proceeding on August 13, 1959, should be and it is affirmed. Counsel for the Board are directed to present within ten days a proposed enforcement decree.
 
 
 3
 WASHINGTON, Circuit Judge (dissenting).
 
 
 4
 This is a petition to review and modify an order of the National Labor Relations Board, reported at 119 N.L.R.B. 998 (1957). As the facts are fully set forth in that report, they need not be repeated in detail here. Briefly, Shamrock Dairy had a collective bargaining agreement with the petitioner union, which represented Shamrock's milk-truck drivers. Shamrock notified the drivers that it would sell its trucks and routes to the drivers, who would then become "independent contractors." It did not bargain with the union before instituting this plan. The union filed a charge, and the General Counsel of the Board issued a complaint. After further proceedings, the Board issued an order requiring Shamrock to cease and desist from (1) refusing to bargain collectively with petitioner with respect to "adoption or continuance of a system of product distribution known as the independent distributorship plan insofar as it affects the tenure of its employees," (2) entering into any new independent distributorship contract before bargaining with petitioner, and (3) "in any like or similar manner interfering with, restraining or coercing its employees in the exercise" of their rights under Section 7 of the Taft-Hartley Act.[1] (Emphasis added).
 
 
 5
 Petitioner union asks that the order be modified so as to reinstate certain drivers who were discharged when they failed to agree to the so-called "independent distributorship plan," that all existing contracts with other drivers be invalidated, and that Shamrock be ordered to bargain with respect to all terms and conditions of employment, not merely tenure. In support of these requests, petitioner maintains that Shamrock violated Sections 8(a) (1), (3) and (5), and 8(d) of the Taft-Hartley Act by adopting the distributorship plan without first bargaining with the union and by discharging the drivers for refusal to sign the individual distributorship contracts. Petitioner asserts that, in failing to invalidate existing contracts, order bargaining on all issues, and reinstate the discharged drivers, the Board has not restored the status quo. The Board responds that to abrogate the existing contracts will not effectuate the policies of the Taft-Hartley Act because Shamrock adopted the independent distributorship plan in the honest belief that the question whether the drivers should have "employee" or "independent contractor" status was one for the individual drivers to determine. Thus, it says, only a technical violation of Section 8(a) (5) was involved rather than a violation of Section 8(d). In addition, the Board maintains that the employees for whom petitioner seeks reinstatement were discharged "for valid economic reasons": Sections 8(a) (1) and (3) were not thereby violated. The Board asserts that since there was a "reasonable basis" for finding the drivers to be independent contractors rather than employees, this finding cannot be challenged.
 
 
 6
 The ultimate question is whether or not the Board's order effectuates the purposes of the Taft-Hartley Act. This depends in turn on whether or not the Board correctly ascertained the extent to which any provision of the Taft-Hartley Act had been violated, and Section 8(d) in particular. Section 8(d) specifies certain bargaining prerequisites where "wages, hours, and other terms and conditions of employment" are concerned.[2] In considering whether or not Shamrock Dairy's acts involved "wages, hours, and other terms and conditions of employment," the Board thought it necessary to determine whether the status of the drivers was changed from "employees" to "independent contractors."
 
 
 7
 The members of the Board were not in agreement on either the status question or the Section 8(d) question. On the status point, Chairman Leedom was of the view that "the individual contracts pertained not to terms or conditions of employment but involved the termination of the employment status * * * and substitution therefor of the status of independent contractor." Decision and Order on Remand, p. 5. From this the Chairman concluded that Section 8(d) was not violated, and that it was not necessary to invalidate the independent distributorship contracts. Chairman Leedom cited two cases supporting his position: Sloan v. Journal Publishing Co., 1958, 213 Or. 324, 324 P.2d 449, and Adams Dairy Co. v. Dairy Employees Union, 1952, 363 Mo. 182, 250 S.W.2d 481, 484. The theory underlying these two cases is that the employer, in deciding to perform his work through independent contractors, is merely exercising his right to hire and fire,[3] and is not taking action affecting wages, hours, and terms and conditions of employment. Members Fanning and Jenkins, on the other hand, concluded that employee status was not lost, pointing to those aspects of the new contracts which deal with earnings and hours.
 
 
 8
 Certainly, it is clear that the new contracts deal with economic questions going far beyond "tenure," if tenure is used to express the duration of a functional, economic relationship rather than a legal relationship. The driver-salesmen continued to perform services with respect to Shamrock products under the distributorship plan — services of a nature much the same as in the past. In fact, the essential economic function that these men performed was not different before or after institution of the distributorship system. But very great changes were made in their relations with Shamrock — changes which in my view were "with respect to wages, hours, and other terms and conditions of employment" within the meaning of Section 8(d).
 
 
 9
 Economically, the new contracts place the drivers at the mercy of Shamrock. Wholesale prices are set by Shamrock. Shamrock can unilaterally terminate any driver's milk contract, on which he must primarily depend. Collective and even individual bargaining is practically precluded because the drivers have agreed not to work for another dairy for two years. Thus, the drivers cannot use their good will as a bargaining weapon against the supplier. The Dairy can reap all good will for itself. Nor are a driver's capital assets of bargaining significance because Shamrock has a re-purchase option on each truck. Price competition on the retail level is unfeasible also because (1) the drivers sell under "recommended" prices from Shamrock — a recommendation enforcible through Shamrock's power of unilateral termination, and (2) retail prices are set in a broad market of which each individual driver forms a relatively insignificant part. Despite the fact that the drivers may carry other products and sell advertising on their vehicles, these cannot be significant factors over which the drivers exercise primary control because (1) in case of conflict with Shamrock, Shamrock may unilaterally terminate the milk contract, and (2) Shamrock may re-purchase the trucks at any time. The drivers cannot extend the geographic confines of their retail markets; thus, Shamrock can effectively control the size of the drivers' labor force. And certainly it cannot be said that an individual driver has any control over the price he pays for gasoline and insurance or over his taxes — the primary costs of the driver. Through these contracts, the drivers are economically tied to Shamrock as effectively as any man working on a wage, piece-rate, or commission basis.
 
 
 10
 How can it possibly be said, in view of these facts, that the new contracts did not change "wages, hours, and other terms and conditions of employment"? Even assuming, arguendo, that the drivers became for some purposes "independent contractors," this does not excuse the Board from recognizing the practical effects of Shamrock's unilateral acts, which in fact changed wages, hours and many other aspects of the former system. Since Shamrock made these changes without complying with Section 8(d), a violation of that section occurred.
 
 
 11
 Counsel for the Board says, on brief, that an independent contractor relationship exists because there is a reasonable basis for this conclusion in the evidence, and the Board found such a relationship, precluding a finding that Section 8(d) was violated. On remand,[4] only one Board member out of four found an independent contractor status, two found that the driver-salesmen retained their employee status, and the fourth made no finding. The order was framed as if all agreed with Chairman Leedom that a change of status occurred. This split among the members of the Board does not prevent this court from deciding the issue of status. Status is not a question of fact under the Taft-Hartley Act,[5] nor does counsel for the Board assert that it is. The issue is one of law, and where the Board has an opportunity to make a specific finding, but fails to do so, this court should make an independent determination.
 
 
 12
 In determining status, the Board and the courts must construe the term "employee" to effectuate the purposes of the Taft-Hartley Act, so long as a departure is not made from the common law standard of "right of control." Where either an independent contractor or an employee status can be regarded as reasonable conclusions from the facts, the Board and the courts are obliged to determine that the employee status exists. First, our duty to effectuate the purposes of the Act was manifested in National Labor Relations Board v. Hearst Publications, 1944, 322 U.S. 111, 120-130, 64 S.Ct. 851, 860, 88 L.Ed. 1170. The Supreme Court there said "`Where all the conditions of the relation require protection, protection ought to be given.'" [Citing Lehigh Valley Coal Co. v. Yensavage, 2 Cir., 1914, 218 F. 547, 552] Id., 322 U.S. at page 129, 64 S.Ct. at page 860. This canon of construction has not been vitiated by the Taft-Hartley Act. Section 2(3) of Taft-Hartley provides: "The term `employee' shall include any employee * * * but shall not include * * * any individual having the status of an independent contractor. * * *"[6] The legislative history of Taft-Hartley indicates that independent contractors were specifically excluded from the term "employee" because of other aspects of the Hearst opinion. In Hearst, the Court had reasoned that common law concepts were irrelevant to a definition of "employee" and that the courts were obliged to sustain any finding of the Board which had "`warrant in the record' and a reasonable basis in law." Hearst, supra, 322 U.S. at page 131, 64 S.Ct. at page 861. The Court treated the Board's finding of employee status as a finding of fact, and it is this element of Hearst to which Taft-Hartley addressed itself primarily. Senator Taft explained Section 2(3)'s reference to independent contractors in the following terms:
 
 
 13
 "The legal effect of the amendment therefore is merely to make it clear that the question whether or not a person is an employee is always a question of law since the term is not meant to embrace persons outside that category under general principles of the law of agency." 93 Cong.Rec. 6441-42 (1947).
 
 
 14
 This remark was made with reference to the bill which was reported from conference and became law. The bill which passed the Senate had not contained any reference to independent contractors, but it is clear that Senator Taft's interpretation is a fair representation of the intent of those in the House who supported this language. The House Conference Report stated that the difficulty that was found with Hearst was "that the ordinary tests of the law of agency could be ignored by the Board in determining whether or not particular occupational groups were `employees' within the meaning of the Labor Act." Conference Report, H.R.Rep. No. 510, 80th Cong., 1st Sess. 32-33 (1947). In the original House report, the majority of the Labor Committee had more fully expressed their dissatisfaction with Hearst, and emphasized that in their view the Supreme Court had improperly given the Board a free hand. In particular, the House Report objected that in Hearst the "employees" had employees of their own. Thus it stated:
 
 
 15
 "An `employee', according to all standard dictionaries, according to the law as the courts have stated it, and according to the understanding of almost everyone, with the exception of members of the National Labor Relations Board, means someone who works for another for hire. But in the case of National Labor Relations Board v. Hearst Publications, Inc. (322 U.S. 111 [64 S.Ct. 851, 88 L.Ed. 1170] (1944)), the Board expanded the definition of the term `employee' beyond anything that it ever had included before, and the Supreme Court, relying upon the theoretic `expertness' of the Board, upheld the Board. In this case the Board held independent merchants who bought newspapers from the publisher and hired people to sell them to be `employees'. The people the merchants hired to sell the papers were `employees' of the merchants, but holding the merchants to be `employees' of the publisher of the papers was most far reaching. It must be presumed that when Congress passed the Labor Act, it intended words it used to have the meanings that they had when Congress passed the act, not new meanings that, 9 years later, the Labor Board might think up. In the law, there always has been a difference, and a big difference, between `employees' and `independent contractors'. `Employees' work for wages or salaries under direct supervision. `Independent contractors' undertake to do a job for a price, decide how the work will be done, usually hire others to do the work, and depend for their income not upon wages, but upon the difference between what they pay for goods, materials, and labor and what they receive for the end result, that is, upon profits. It is inconceivable that Congress, when it passed the act, authorized the Board to give to every word in the act whatever meaning it wished. On the contrary, Congress intended then, and it intends now, that the Board give to words not farfetched meanings but ordinary meanings. To correct what the Board has done, and what the Supreme Court, putting misplaced reliance upon the Board's expertness, has approved, the bill excludes `independent contractors' from the definition of `employee'." Legislative History of Labor Management Relations Act, Vol. 1, p. 309 (1947).
 
 
 16
 I think Taft-Hartley goes no further than to assure that, as Senator Taft stated, "the general principles" of the law of agency will be considered. It does not make tort law the exclusive standard. This conclusion is buttressed by the fact that no objection was raised in the Committee Reports to National Labor Relations Board v. E. C. Atkins & Co., 1947, 331 U.S. 398, 67 S.Ct. 1265, 91 L.Ed. 1563, which reiterated the Hearst policy with respect to effectuating the policies of the Act.
 
 
 17
 Accordingly, I believe that even though the right of control is now an essential consideration in determining whether or not a person has "employee" status, the Board and the courts must consider other factors. Certainly where conflicting inferences can be drawn from the facts, so as to support either a conclusion of employee or independent contractor status by the common law "right of control" test, considerations of Taft-Hartley policy should be persuasive.
 
 
 18
 The consequences which may flow from denying employee status demonstrate that, absent facts which clearly show independent contractor or employee status at common law, special considerations relevant to Taft-Hartley must be determinative. Independent contractors have limited legal protection if they attempt to organize, bargain collectively, or otherwise control their income through concerted action. An employer will not be obliged to bargain collectively with them, and if they act in concert to control their income by fixing resale prices they may be subject to Sherman Act prosecution. See Note, 67 Yale L.J. 98-100 (1957). Moreover, a determination in a Taft-Hartley case that certain agents are independent contractors might be persuasive in a proceeding by the principal to circumvent the Norris-LaGuardia Act and enjoin particular actions by those agents. And it may be to the principal's disadvantage that its "agents" are not employees, for picketing by organized, independent "agents" may be outside Section 8(b) (4). See Chauffeurs Union, 116 N.L.R.B. 955 (1956). In addition, other persons engaged as employees by competitors of a principal whose agents are in the independent contractor category may find their principal's profits, and consequently their wages, undercut by price competition from the "independent" agents. In short, a determination of independent contractor status does not merely affect the union as an organizational entity, but affects all persons who perform functions economically similar to those performed by persons represented by the union. Since discontent among these "agents" who are economically similarly situated may create friction among themselves and with those upon whom they are economically dependent, it is essential in the interest of industrial peace that all factors relevant to Taft-Hartley policy be considered, as well as the "right of control."
 
 
 19
 Particularly relevant to Taft-Hartley's objective of preserving industrial peace is the "agent's" ability substantially to control his net income by virtue of his bargaining power in any of the particular markets in which he is involved. If a particular "agent" lacks bargaining power with respect to his principal suppliers, it is important to industrial peace that he at least be able to control his net income by reducing his costs, or increasing his retail price. As we have seen, Shamrock's drivers are practically impotent in these respects. Thus, I believe these driver-salesmen remain "employees" within the meaning of Taft-Hartley.
 
 
 20
 Furthermore, apart from special Taft-Hartley considerations, I think the drivers are still employees, even under the "right of control" test used at common law. Counsel for the Board and for the union both accept the statement of Judge Learned Hand in Radio City Music Hall Corp. v. United States, 2 Cir., 1943, 135 F.2d 715, 717, that "The test lies in the degree to which the principal may intervene to control the details of the agent's performance; and that in the end is all that can be said * * *." It is interesting to note that Judge Hand used this definition to deny employee status under the Social Security Act to actors — a group which now benefits from Taft-Hartley protection. Nevertheless, the petitioner union has accepted Judge Hand's definition and demonstrated, convincingly, I think, that the drivers have not lost their employee status even by this definition. Control by Shamrock of the details of their performance on the job is all pervasive. In fact, counsel for the Board does not assert flatly that the salesmen-drivers are independent contractors, but that the Board had a reasonable basis for so finding. The Board is, by that argument, trying to resurrect the very portion of Hearst at which the Taft-Hartley amendment was most certainly aimed — the policy of viewing status as a question of fact, subject only to limited review.
 
 
 21
 Since the drivers have not lost their status as employees, their tenure has not been affected. The new contracts relate to terms and conditions of employment. These contracts were entered into without the 60-day notice required by Section 8(d) and in violation of an express provision of the existing collective bargaining agreement that employees would not be asked to sign contracts in conflict with the collective agreement. Section 8(d) has been violated. Accordingly, I think Shamrock should be deprived of the fruit of the violation: the individual contracts should be invalidated.
 
 
 22
 The discharged employees should also have been reinstated. The Board found as a fact that these employees were not discharged to discourage union membership. Be that as it may, these men had a right to refuse the independent distributorship contracts because the contracts were not entered into pursuant to a collective bargaining agreement or after the breakdown of good faith collective bargaining. See Medo Photo Supply Corp. v. National Labor Relations Board, 1944, 321 U.S. 678, 683, 64 S.Ct. 830, 88 L.Ed. 1007; Lion Oil Co. v. National Labor Relations Board, 8 Cir., 1957, 245 F.2d 376, 379. Individual bargaining under these circumstances violates Sections 8(a) (1) and 8(a) (5).
 
 
 23
 For these reasons, I would remand the case to the Board for further proceedings not inconsistent with the foregoing.
 
 
 
 Notes:
 
 
 [1]
 61 Stat. 140, 29 U.S.C.A. § 157
 
 
 [2]
 Section 8(d) provides in pertinent part:
 "(d) For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession: Provided, That where there is in effect a collective-bargaining contract covering employees in an industry affecting commerce, the duty to bargain collectively shall also mean that no party to such contract shall terminate or modify such contract, unless the party desiring such termination or modification —
 "(1) serves a written notice upon the other party to the contract of the proposed termination or modification sixty days prior to the expiration date thereof, or in the event such contract contains no expiration date, sixty days prior to the time it is proposed to make such termination or modification;
 "(2) offers to meet and confer with the other party for the purpose of negotiating a new contract or a contract containing the proposed modifications;
 "(3) notifies the Federal Mediation and Conciliation Service within thirty days after such notice of the existence of a dispute, and simultaneously therewith notifies any State or Territorial agency established to mediate and conciliate disputes within the State or Territory where the dispute occurred, provided no agreement has been reached by that time; and
 "(4) continues in full force and effect, without resorting to strike or lock-out, all the terms and conditions of the existing contract for a period of sixty days after such notice is given or until the expiration date of such contract, whichever occurs later. * * *"
 
 
 [3]
 In Adams Dairy, the Dairy had discharged its old drivers and contracted with new drivers for the sale of trucks and delivery of milk under terms not unlike those in Shamrock. The Diary sought an injunction to prevent the union from striking and picketing in protest to these contracts and discharges. The union defended on the ground that the Dairy had breached its collective bargaining agreement, which provided that "any major changes in the present working conditions or rules must be mutually agreed to by the Union, employees, and Employer * * *." The court held that these new contracts did not involve terms and conditions of employment and thus did not violate the collective bargaining agreement clause forbidding the employer to request employees to make contracts inconsistent with the coltive agreement
 In Sloan v. Journal Publishing Co., 69 independent newspaper distributors sought to enjoin the Journal Publishing Company, under pressure from the American Newspaper Guild, from discontinuing a recently-instituted independent distributorship plan. On request from distributor-employees, the Journal had entered into an agreement whereby the distributors earned their income by purchase and resale instead of wages and commissions. The Guild, which was also a defendant, answered that the distributorship plan was adopted in violation of a pre-existing collective bargaining agreement and that discontinuance of the plan merely constituted a decision to cease breaching the collective agreement. The court held that the independent plan did not breach the collective agreement because the Journal had simply exercised "one of the traditional and fundamental rights of management to decide for itself whether to perform its functions by employees or by independent contracts * * *." 324 P.2d at page 458. Since the court found that this right had not been expressly waived in the collective agreement, the Guild's defense was unavailing.
 
 
 [4]
 We remanded the case to the Board, after hearing argument, to give it an opportunity to clarify its findings. It was unable to do so. The text of the decision and order on remand appears at 124 N.L.R.B. No. 63
 
 
 [5]
 See the remarks of Senator Taft and the legislative history of Section 2(3), recited infra
 
 
 [6]
 61 Stat. 137, 29 U.S.C.A. § 152(3)