**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

**v.**

**ROYAL PLATING AND POLISHING CO., Inc., Respondent.**

**No. 15112.**

United States Court of Appeals
Third Circuit.

Argued May 20, 1965.

Decided Sept. 1, 1965.

Gary Green, N.L.R.B., Washington, D. C. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Harold B. Shore, Attorney, N.L.R.B., on the brief), for petitioner.

Edward N. Schwartz, Newark, N. J., (Milton H. Goldberger, Newark, N. J., on the brief), for respondent.

Before BIGGS, Chief Judge, and STALEY and GANEY, Circuit Judges.

BIGGS, Chief Judge.

This case, before us on a petition to enforce the order of the National Labor Relations Board, presents the issue of whether an employer's unilateral decision to close a part of his business solely for economic reasons, under the facts as will be set out hereafter, constitutes a refusal to bargain in violation of Sections 8(a) (5) and (1) of the National Labor Relations Act.

Royal Plating and Polishing Co., Inc. (the Company) was for many years engaged in the metal plating and polishing business at two plants located within two blocks of each other in Newark, New Jersey. The larger plant was located at 152 Bleeker Street, the Bleeker Street plant, and the other at 70 Sussex Avenue, the Sussex Avenue plant. The two plants constitute a single bargaining unit. The Company has recognized the Metal Polishers, Buffers, Platers and Helpers International Union, Local 44, AFL–CIO (the Union) as the bargaining represent-ative of the production and maintenance employees for seventeen years and the Union has been certified by the Board as the exclusive bargaining representative for these employees since 1960. The facts disclose that over the years there has been little labor trouble between the Company and the Union and that there had never been a strike at either plant prior to the current dispute.

The contract in force at the time the current dispute arose expired on April 17, 1963. The Union notified the Company's President, Joseph Barile, in February and March that it wished to negotiate a new contract and the first bargaining session was held on April 30, 1963. Following the negotiation pattern set in the past seven or eight years, the Union stated its demands and Barile informed the Union that the Company was losing money, that it could not afford an increase and that before he would grant a wage increase he would close the plant. The Company and the Union again met on May 7 but little progress was made in the negotiations. There was another meeting on the morning of May 17. At that meeting the Union notified Barile that its members had authorized a strike if Barile would not make a reasonable wage offer. Barile reiterated his former position and a strike was called. The parties again met that afternoon, this time with the aid of the Federal Mediation and Conciliation Service. After extended negotiations, the Company and the Union agreed on a new contract and a document embodying this agreement was signed on May 23.

While these contract negotiations were in progress, Barile was also negotiating with the Housing Authority of Newark over the sale of the Bleeker Street plant to the Authority. At some previous date not clear from the record, the area in which that plant was located had been designated for redevelopment and Barile had been attempting to negotiate a favorable sales price for the Bleeker Street plant. On May 14,[1] the Company,

---

1. The date recorded in the printed record is May 14, 1962, but it is clear from a reading of the entire record that the correct year is 1963.

through Barile, granted the Housing Authority an irrevocable 90-day option to purchase the plant.

Subsequent to the execution of the new contract between the Company and the Union, the Housing Authority exercised its option and allowed the Company a six months maximum tenancy. The Company immediately began laying off employees and closed down the plant entirely in June of 1963. On July 10, the machinery and equipment were sold at public auction. The Company continued to operate the Sussex Avenue plant for a short time, but that plant was sold on September 1. The alleged unfair labor practice for a refusal to bargain relates only to the shutting down of the Bleeker Street plant.

The Trial Examiner found that Barile failed to inform the Union of his intention to sell the plant and liquidate until June 14, at which time the Union was handed a *fait accompli,* and that prior to that time Barile had been evasive and ambiguous in replies made to inquiries from employees respecting his intentions regarding the operation of the enterprise.

The Trial Examiner concluded that Barile's conduct resulted in a refusal to bargain over the closing of the Bleeker Street plant. He found, further, that Barile's conduct also resulted in bad faith bargaining during the contract negotiations. The view of the Trial Examiner, on this issue, was in substance that because Barile hid his intentions the Union was compelled to negotiate blindly about wages, while, under the circumstances, these questions became less important than issues relating to the effect of a shutdown on the employees

such as "severance and termination pay, insurance and pension funds, and like subjects that might be expected to arise when a business is being closed."

The full Board affirmed the findings and conclusions of the Trial Examiner and, in addition, ordered backpay to December 4, 1963, the date on which the Company was required to vacate the premises.[2, 3]

The core of the Board's finding of an unfair labor practice depends on the finding of fact that the Company and Barile withheld knowledge of the Company's plans to terminate the operations from the Union, thereby preventing bargaining on issues presented by the shutdown. The Company argues that it did inform the employees. However, the Trial Examiner chose not to believe the testimony of Barile and to credit the testimony of the employees supporting the finding that Barile was, at best, evasive and ambiguous about his future plans for the Company even after the new contract was negotiated and that it was not until June 14 that the Company's decision to close the plant was made clear to the employees. There is ample evidence to support the Board's finding and this court may not disturb that finding. Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); Philadelphia Marine Trade Ass'n v. NLRB, 330 F.2d 492, 495 (3 Cir. 1964); NLRB v. Chas. S. Wood & Co., 309 F.2d 140 (3 Cir. 1962). The Company also argues that the employees were put on notice that there would be some change in operations because it was publicly known that the area had been designated for redevelopment. However, even if this is true it does not necessarily

2. 148 NLRB No. 59. Member Leedom concurred solely on the ground that the Company failed to bargain over the effects of a shutdown on the employees. He dissented from the remedy ordered by the Board. Member Jenkins concurred solely on the ground that the bargaining that took place was not good faith bargaining and, although agreeing that backpay was appropriate, thought that the cut-off date for backpay should be September 1, 1963,

the date on which the company ceased operations completely.

3. In a subsequent, supplemental opinion and order, the Board modified its backpay award to August 31, 1963, the date on which the Company completely terminated its business. The Board adhered to its earlier finding that the Company had committed an unfair labor practice by its refusal to bargain.

mean that the Company would discontinue operations, since it could have continued operations at another location. The Company also contends that plant rumors and gossip put the employees on notice. However, plant gossip, conjecture and rumors cannot take the place of formal notice when notice is required. NLRB v. Rapid Bindery, Inc., 293 F.2d 170 (2 Cir. 1961).

■ The Company also asserts that this case must be viewed as one involving a complete cessation of business. This position is without merit. The record plainly indicates that on May 17 Barile had decided to cease the operations at the Bleeker Street plant but that at that time his intention was to continue to operate the Sussex Avenue plant in the hope that the Company could extricate itself from financial difficulties through a profitable operation at the smaller plant. The fact that it later became obvious that this could not be accomplished and that all operations would have to come to a halt cannot erase the earlier alleged unfair labor practice. District 65, Retail, Wholesale & Department Store Union v. NLRB, 294 F.2d 364, 369 (3 Cir. 1961).

■■ The Board found that by unilaterally closing the Bleeker Street plant, the Company violated Sections 8(a) (5) and (1) of the Act. The validity of this decision, under the facts of this case, depends on whether such a partial termination of operations is a mandatory subject of bargaining under Section 8(d) of the Act, which provides for mandatory bargaining "in good faith with respect to wages, hours, and other terms and conditions of employment." The words used by Congress in this section are broad and in each case the interests of the employees and the purpose of the National Labor Relations Act in securing industrial tranquility must be carefully balanced against the right of an employer to run his business. See Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964).

In the case at bar, it is clear that the Company has had severe losses in recent years and Barile had been, for sometime, considering termination of the business. However, the events precipitating the Bleeker Street plant shutdown were the negotiations with the Housing Authority. This was not a purely voluntary sale since the Housing Authority could force a sale through the use of its condemnation power. In fact, the record shows, according to Barile's uncontradicted testimony, that the offer finally accepted by Barile was tendered as a final offer and Barile was told that if he wanted more money he would have to go to the courts to get it. Barile was faced with a decision of accepting the offer or litigating the question of market value, with all the attendant risks and costs of litigation. There was no room for union negotiation in these circumstances. The Union could only attempt to persuade Barile to move his operations to another location.

In Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964), the Supreme Court held that the decision to subcontract maintenance work formerly performed by employees of the company was subject to the provisions of Sections 8(a) (5) and (d) of the Act. However, in the cited case there was no change in the economic direction of the company and the same functions were to be performed by the independent contractor as were performed formerly by the Company's own employees. The decision of the management in Fibreboard involved no decision respecting commitment of capital investment. The decision to subcontract was solely to affect economies by "reducing the work force, decreasing fringe benefits, and eliminating overtime payments." 379 U.S. at 213, 85 S.Ct. at

404. Thus, such cost-cutting decisions are "suitable for resolution within the collective bargaining framework * *." Id. at 214, 85 S.Ct. at 404. See also Order of Railroad Telegraphers v. Chicago & N. W. Ry., 362 U.S. 330, 80 S.Ct. 761, 4 L.Ed.2d 774 (1960).

Here the facts are dissimilar. The decision to close the Bleeker Street plant rather than move the operations to another location involved a management decision to recommit and reinvest funds in the business. The business had been suffering severe losses for approximately seven years and the management had to decide whether the business should be continued. There is no question but that the decision to terminate was made for economic reasons. The decision involved a major change in the economic direction of the Company. "Nothing the Court holds today should be understood as imposing a duty to bargain collectively regarding such managerial decisions, which lie at the core of entreprenurial control. Decisions concerning the commitment of investment capital and the basic scope of the enterprise are not in themselves primarily about conditions of employment, though the effect of the decision may be necessarily to terminate employment. * * * [T]hose management decisions which are fundamental to the basic direction of a corporate enterprise or which impinge only indirectly upon employment security should be excluded from that area [Section 8(d)]." Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203, 217, 223, 85 S.Ct. 398, 409, 13 L.Ed.2d 233 (1964) (concurring opinion of Mr. Justice Stewart). See 379 U.S. at 213–215, 85 S.Ct. 398 (Opinion of the Court); see also Textile Workers Union v. Darlington Mfg. Co., 380 U.S. 263, 267 at n. 5, 85 S.Ct. 994, 13 L.Ed.2d 827 (1965). We conclude that an employer faced with the economic necessity of either moving or consolidating the operations of a failing business has no duty to bargain with the union respecting its decision to shut down.[4]

However, under circumstances such as those presented by the case at bar an employer is still under an obligation to notify the union of its intentions so that the union may be given an opportunity to bargain over the rights of the employees whose employment status will be altered by the managerial decision. NLRB v. Rapid Bindery, Inc., 293 F.2d 170 (2 Cir. 1961). See also NLRB v. Lewis, 246 F.2d 886 (9 Cir. 1957); Shamrock Dairy, Inc., 119 NLRB 998 (1957), 124 NLRB 494 (1959), enforced sub nom., International Bhd. of Teamsters etc. v. NLRB, 108 U.S.App.D.C. 117, 280 F.2d 665, cert. denied, 364 U.S. 892, 81 S.Ct. 224, 5 L.Ed.2d 188 (1960). Bargainable issues such as severance pay, seniority and pensions, among others, are necessarily of particular relevance and importance. Cf. John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 554, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964); Inland Steel Co. v. NLRB, 170 F.2d 247, 12 A.L.R.2d 240 (7 Cir. 1948), cert. denied, 336 U.S. 960, 69 S.Ct. 887, 93 L.Ed. 1112 (1949); NLRB v. Westinghouse Air Brake Co., 120 F.2d 1004 (3 Cir. 1941).

There can be no doubt that the Company, by withholding information of its intention to terminate the Bleeker Street operations, deterred the Union from bargaining over the effect of the shutdown on the employees. However, we find that the present record is insufficient to determine whether the Board was correct in finding that this action resulted in an unfair labor practice. The Board's finding on this issue was, in part, based on its determination that the plant closing was itself an unfair labor practice. To this extent, the Board should

---

4. Of course, if, in similar circumstances, there is a discriminatory motive in the partial closing, the employer's action would be prohibited. Textile Workers Union v. Darlington Mfg. Co., 380 U.S. 263, 85 S.Ct. 994, 13 L.Ed.2d 827 (1965).

have an opportunity to reexamine the record, and take additional evidence if necessary, in order to determine whether the Company's actions in this regard constituted an unfair labor practice, independent of the issue of the unilateral closing of the Bleeker Street plant. See NLRB v. Metropolitan Life Insurance Co., 380 U.S. 438, 443–444, 85 S.Ct. 1061, 13 L.Ed.2d 951 (1965). Should the Board conclude that the Company has violated Sections 8(a) (5) and (1) of the Act, it must also reexamine its remedy since that too was, in part, based on its determination that the unilateral plant closing was itself an unfair labor practice.

We direct the Board's attention to events that may have transpired since June 14, 1963. As we read the record, the Union made very little effort to bargain in respect to the effects of the shutdown after the Company's decision was transmitted to the Union. Furthermore, the Company asserts in its brief that it has continued to bargain "with respect to such questions as were raised by the Union."[5] While these facts, if they be supported by evidence, would not necessarily remedy the refusal to bargain, they, considered with other relevant circumstances, may present a situation in which effectuation of the purposes of the Act might not require a remedial order even though there has been a technical violation of the Act. New York Mirror, Division of the Hearst Corp., 151 NLRB No. 110 (1965).

In the light of the foregoing enforcement of the order of the Board will be denied and the case will be remanded to the Board to make further findings and, if necessary, to take further evidence to the end that there may be a determination based solely on the refusal to bargain over the effect of the plant closing on the employees independent of the unilateral decision to close the Bleeker Street plant.

[5] Of course, this assertion must be scrutinized by the fact-finding processes of the Board and must become a part of the record before it can be utilized as a basis

for decision here. Matter of Strubbe, 347 F.2d 217 (3 Cir. 1965); United States v. Bowles, 331 F.2d 742, 746 at n. 11 (3 Cir. 1964).