NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

FIRST NATIONAL MAINTENANCE
CORP., Respondent.

No. 891, Docket 79–4167.

United States Court of Appeals,
Second Circuit.

Argued March 20, 1980.

Decided July 9, 1980.

William R. Stewart, Deputy Asst. Gen. Counsel, L. Joseph Ferrara, Atty., Washington, D. C. (William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Washington, D. C., for petitioner.

Milman, Naness & Pollack, Hewlett, N. Y. (Sanford E. Pollack, Hewlett, N. Y., of counsel), for respondent.

Before TIMBERS and KEARSE, Circuit Judges, and LASKER, District Judge.*

LASKER, District Judge.

This case presents the issue whether an employer has the duty to bargain with the union representing its employees as to a decision to close part of its operations.

The National Labor Relations Board (NLRB or the Board) seeks enforcement of its order of May 23, 1979 [1] which, based on the findings of the Administrative Law Judge that First National Maintenance Corporation (FNM) violated sections 8(a)(5) and (1) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(5), 158(a)(1), by refusing to bargain with the union [2] representing certain of its employees, directs FNM to bargain with the union, to reinstate those employees, and to grant them back pay.

I.

FNM is in the business of providing cleaning and maintenance services to commercial customers. During the spring of

2. The Union elected and certified is District 1199, National Union of Hospital and Health Care Employees, Retail, Wholesale and Department Store Union, AFL–CIO.

1. The NLRB's order is at 242 NLRB No. 72.

1977, FNM serviced between two and four nursing homes. The approximately 35 employees who staffed its operation at the Greenpark Care Center (Greenpark) chose the union as their representative on March 31, 1977 and the NLRB certified the union on May 11th. On July 12th, the union wrote to FNM requesting a meeting to negotiate a collective bargaining agreement. There is no evidence that FNM responded to that letter.

During the spring and summer of 1977, FNM determined that it was losing money at Greenpark, and discontinued its services there as of August 1st. It did not notify the union before taking this action. On July 28th, FNM informed its Greenpark employees that they would be discharged on July 31st.

The same day, the union's vice president, Edward Wecker, telephoned FNM's secretary-treasurer and one-third shareholder, Leonard Marsh, requesting that FNM "stay on" at Greenpark. Marsh answered that FNM could not continue its operation there because of financial reasons. When Wecker asked whether they could meet to discuss the situation, Marsh said, " 'We have nothing to discuss.' " The union and FNM had no further communications until the unfair labor practice charges were filed.

The NLRB found that FNM had violated Section 8(a)(5) and (1) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(5), 158(a)(1), and ordered FNM to bargain with the union upon request as to the decision to close its Greenpark operation; if the Greenpark services were resumed, to offer reinstatement to the discharged employees, and if no agreement to resume operations were reached, to bargain as to the effects of the closing and to establish preferential hiring for the terminated employees at its other operations. The order also awarded back pay to the discharged employees.

## II.

FNM does not dispute that it had a duty to respond to the July 12th letter sent by the union requesting a meeting to negotiate a collective bargaining agreement, and the

parties have stipulated as to FNM's duty to bargain as to the effects of the Greenpark closing. Consequently, the only issue before us relates to FNM's duty to bargain as to its decision to terminate its Greenpark services.

Sections 8(a)(5) and 8(d) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(5), 158(d), together make it an unfair labor practice for an employer to refuse to bargain with the union "with respect to wages, hours and other terms and conditions of employment." *See, e. g., Allied Chemical & Alkali Workers v. Pittsburgh Plate Glass Co.,* 404 U.S. 157, 164, 92 S.Ct. 383, 389, 30 L.Ed.2d 341 (1971); *Fibreboard Paper Products Corp. v. NLRB,* 379 U.S. 203, 210, 85 S.Ct. 398, 402, 13 L.Ed.2d 233 (1964). The present issue, then, is whether the decision to close the Greenpark operation affected the employees' "terms and conditions of employment" within the meaning of the statute.

The seminal case on the subject is *Fibreboard Paper Products Corp. v. NLRB, supra,* 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964). There the Court held to be an unfair labor practice the employer's refusal to bargain as to the decision to contract out plant maintenance work formerly performed by its employees. *Id.* at 215, 85 S.Ct. at 405.

The Court found that

"The subject matter of the present dispute is well within the literal meaning of the phrase 'terms and conditions of employment.' . . . A stipulation with respect to the contracting out of work performed by members of the bargaining unit might appropriately be called a 'condition of employment.' The words even more plainly cover termination of employment which, as the facts of this case indicate, necessarily results from the contracting out of work performed by members of the established bargaining unit."

*Id.* at 210, 85 S.Ct. at 403 (citation omitted). The Court based its decision not only on the language of the statute but on the premise that requiring an employer to bargain in

the circumstances would promote the purposes of the statute, that such a requirement was supported by industrial bargaining practices in the country, and that it "would not significantly abridge [the employer's] freedom to manage the business." *Id.* at 210–11, 213, 85 S.Ct. at 404.

> Accordingly, the Court held
>
> that the type of 'contracting out' involved in this case—the replacement of employees in the existing bargaining unit with those of an independent contractor to do the same work under similar conditions of employment—is a statutory subject of collective bargaining under § 8(d). Our decision need not and does not encompass other forms of 'contracting out' or 'subcontracting' which arise daily in our complex economy."

*Id.* at 215, 85 S.Ct. at 405 (footnote omitted).

Although the decision in *Fibreboard* takes us part of the way, it does not fully determine the issue here: the obligation of an employer to bargain in the case of the closing of part of his facilities. *Fibreboard* was expressly limited to its facts, and they are distinguishable on the grounds that *Fibreboard* involved a less significant change in the employer's business. In *Fibreboard, after* the decision to contract out, the business continued to operate unchanged except for the use of the employees of the subcontractor for those of Fibreboard performing the same work under the same conditions. On the other hand, in a partial closing case, a portion of the employer's business—of course, how large a portion varies with each case—ceases to operate altogether.

Moreover, in *Fibreboard*, the Court did not specify how the three considerations which it noted—the statute's purpose, industrial practice, and the employer's entrepreneurial prerogative—related to the initial finding whether the statute literally applied. Consequently, it is unclear whether the duty to bargain imposed in *Fibreboard* derived solely from a finding that the case fell within the literal reach of the

statutory language or whether some or all [3] of the additional considerations noted by the Court are necessary to the imposition of a duty to bargain.

The lack of clear direction provided by *Fibreboard* on this point is made even more difficult by the conflicting positions taken by the NLRB and most circuit courts that, since *Fibreboard*, have addressed the issue of the duty to bargain in the case of a proposed partial closing.

In *Ozark Trailers, Inc.*, 161 N.L.R.B. 561 (1966), the NLRB held to be a subject of mandatory bargaining the decision to close one of the multiple truck manufacturing plants operated by the employer. The Board disagreed with the view espoused by two circuit courts, *see NLRB v. Royal Plating & Polishing Co.*, 350 F.2d 191 (3d Cir. 1965); *NLRB v. Adams Dairy, Inc.*, 350 F.2d 108 (8th Cir. 1965), *cert. denied*, 382 U.S. 1011, 86 S.Ct. 619, 15 L.Ed.2d 526 (1966), that the decision whether to impose a duty to bargain should depend on how "significant" or "major" is the change contemplated by the employer. The Board noted that a significant change in the employer's business is likely to be significant from the employees' perspective as well.

> "And, just as the employer's interest in the protection of his capital investment is entitled to consideration in our interpretation of the Act, so too is the employee's interest in the protection of his livelihood."

The Board also found that the purpose of the statute—to promote industrial peace—would be served by finding that the employer had a duty to bargain, and that the subject was suited to bargaining because one of the reasons for the Ozark closing was the cost of labor. Finally, the Board noted that imposition of a duty to bargain would not significantly abridge the employer's freedom to conduct his business, since

> "an employer's obligation to bargain does not include the obligation to agree, but solely to engage in a full and frank dis-

---

**3.** This interpretation that all of the *Fibreboard* "factors" are a prerequisite to a duty to bargain is set forth in the discussion at 47 Geo.Wash.L. Rev. 679, 699 (1979).

cussion with the collective-bargaining representative in which a bona fide effort will be made to explore possible alternatives, if any, that may achieve a mutually satisfactory accommodation of the interests of both the employer and the employees. If such efforts fail, the employer is wholly free to make and effectuate his decision."

On the other hand, the circuit courts until recently have generally declined to impose a duty to bargain as to a partial closing when the decision to close was based on the employer's desire to effect a shift in capital or a major change in its business, *NLRB v. Adams Dairy, Inc.*, 350 F.2d 108, 113 (8th Cir. 1965), *cert. denied*, 382 U.S. 1011, 86 S.Ct. 619, 15 L.Ed.2d 526 (1966), or was due to severe economic loss or other considerations beyond the employer's control, *Royal Typewriter Co. v. NLRB*, 533 F.2d 1030, 1039 (8th Cir. 1976) (dicta); *NLRB v. Thompson Transport Co.*, 406 F.2d 698, 703 (10th Cir. 1969); *NLRB v. Transmarine Navigation Corp.*, 380 F.2d 933, 939 (9th Cir. 1967); *NLRB v. Royal Plating & Polishing Co.*, 350 F.2d 191, 196 (3d Cir. 1965). *But see NLRB v. Winn-Dixie Stores, Inc.*, 361 F.2d 512, 517 (5th Cir.), *cert. denied*, 385 U.S. 935, 87 S.Ct. 295, 17 L.Ed.2d 215 (1966); *NLRB v. American Manufacturing Co.*, 351 F.2d 74, 80 (5th Cir. 1965).[4]

Recently, in an opinion that exhaustively discussed the relevant legal precedent and policy considerations, the Third Circuit treated the question whether bargaining was mandatory as to a partial closing.[5] In *Brockway Motor Trucks v. NLRB*, 582 F.2d 720, 735 (3d Cir. 1978), the court rejected a per se rule in favor of "an initial presump-

tion, founded on statutory purposes and language that a partial closing is a mandatory subject of bargaining," followed by an examination of the facts of each case and balancing the parties' interests in compelling bargaining or not.

On the one hand "[o]f chief concern to the employees is the prospect of losing their jobs. It is in fact difficult to imagine any result of a decision by the employer about which labor would be more highly sensitized." *Id.* at 735 (footnote omitted). Accordingly, a union would naturally seek to bargain with the employer to attempt to find a way to avoid closing the facility. On the other hand, the interest of the employer in not bargaining asserted in *Brockway* was its "freedom to determine the company's direction" unhindered. *Id.* at 738.

Although the court found no evidence in the record—such as severe economic difficulties or action of a third party which would render bargaining futile—suggesting that imposition of a duty to bargain would interfere with that freedom, *id.* at 738–39, it refused to enforce the Board's order because the record was unclear as to the precise nature of the employer's interest in not bargaining. *Id.* at 740.

### III.

■ It may be argued that a per se rule, although rejected in *Brockway*, 582 F.2d at 731–34, should be adopted: either imposing a duty to bargain whenever an employer closes part of its business (although the NLRB does urge this position), or absolving the employer of a duty to bargain whenever the decision to close is based on economic

---

4. In *NLRB v. Rapid Bindery, Inc.*, 293 F.2d 170, 176 (2d Cir. 1961), the Second Circuit held that the decision to transfer work from one plant to another and to close the first plant

"was not a required subject of collective bargaining, as it was clearly within the realm of managerial discretion. However, once that decision was made, § 8(a)(5) requires that notice of it be given to the union so that the negotiators could then consider the treatment due to those employees whose conditions of employment would be radically changed by the move. Nothing affects conditions of employment more than a curtailing of work, and

such a curtailment is properly the subject of collective bargaining."

This decision does not compel a result contrary to that reached here since it pre-dates *Fibreboard*, in which, as indicated, the decision to contract out work which resulted in the layoff of employees was held to be a mandatory subject of bargaining.

5. A provocative treatment of *Brockway* may be found in Comment, *Duty To Bargain About Termination of Operations: Brockway Motor Trucks v. NLRB*, 92 Harv.L.Rev. 768 (1979).

considerations (which is FNM's position). Yet we agree with the Third Circuit that a per se rule is inappropriate in an area whose parameters are not clearly defined by the statute or by Supreme Court precedent.

■ Although the rationale of *Fibreboard* is not altogether clear, we believe that the decision at least supports the rejection of a per se rule imposing a duty to bargain, since such a rigid approach would ignore additional relevant considerations such as the three mentioned by the Court. *Fibreboard* also indicates the inappropriateness of a per se rule pointing in the other direction. In rejecting the contention that the employer should not have to bargain because its decision was based on economic considerations, the Court stated:

> "although it is not possible to say whether a satisfactory solution could be reached, national labor policy is founded upon the congressional determination that the chances are good enough to warrant subjecting such issues to the process of collective negotiation."

379 U.S. at 214, 85 S.Ct. at 404–405; *see Brockway, supra,* 582 F.2d at 739.

■ We also agree with the *Brockway* court that the correct approach is to establish a presumption that a duty to bargain exists. A partial closing[6] affects "terms and conditions of employment" at least as much as does the decision to contract out which the *Fibreboard* Court found to fall within the literal meaning of the statute. Equally important is the fact that it is the employer who has access to the facts surrounding the decision to close, and consequently is in a position to justify its making that decision without first bargaining over it.

■ However, we disagree with *Brockway* that a determinative factor should be a balancing of the respective interests of the employer and employees in bargaining. We believe that the determination whether to impose a duty to bargain should not depend on the relative injury to the employer and the employees, but rather on the relative merits of the arguments put forth as to those classic considerations of whether the purposes of the statute are furthered by the decision to impose a duty to bargain in a particular case.

■ Accordingly, the presumption that the employer has an obligation to bargain over a decision partially to close the business may be rebutted by showing that the purposes of the statute would not be furthered by imposition of a duty to bargain. Without an attempt to enumerate all those instances in which the presumption may be rebutted, a few examples may be noted for purposes of illustration. The employer might overcome the presumption by demonstrating that bargaining over the decision would be futile, since the purposes of the statute would not be served by ordering the parties to bargain when it is clear that the employer's decision cannot be changed. Other relevant considerations would be that the closing was due to emergency financial circumstances, or that the custom of the

---

**6.** In *Textile Workers Union v. Darlington Mfg. Co.,* 380 U.S. 263, 85 S.Ct. 994, 13 L.Ed.2d 827 (1965), the Supreme Court held that

> when an employer closes his entire business, even if the liquidation is motivated by vindictiveness toward the union, such action is not an unfair labor practice."

*Id.* at 273–74, 85 S.Ct. at 1001 (footnote omitted). The Court distinguished a "partial" closing, however, and held that

> "a partial closing is an unfair labor practice under § 8(a)(3) if motivated by a purpose to chill unionism in any of the remaining plants of the single employer and if the employer may reasonably have foreseen that such closing would likely have that effect."

*Id.* at 275, 85 S.Ct. at 1002. That case did not involve the question whether the employer's decision constituted a mandatory subject of bargaining, as the Court noted that

> "no argument is made that § 8(a)(5) requires an employer to bargain concerning a purely business decision to terminate his enterprise. Cf. *Fibreboard Paper Products Corp. v. Labor Board,* 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233."

*Id.* at 267 n. 5, 85 S.Ct. at 998.

Since the issue is not before us, we express no opinion as to whether the distinction between a complete and partial closing recognized in *Textile Workers* is significant in a mandatory bargaining case.

industry, shown by the absence of such an obligation from typical collective bargaining agreements, is not to bargain over such decisions. The presumption might also be rebutted if it could be demonstrated that forcing the employer to bargain would endanger the vitality of the entire business, so that the purposes of the statute would not be furthered by mandating bargaining to benefit some employees to the potential detriment of the remainder. This might be a particularly significant point if the number to be laid off was small and the number of the remainder was large.[7]

## IV.

■ Turning to the present case, the decision to close the Greenpark operation clearly falls within the literal language of the statute. That decision terminated the employment of FNM's 35 employees there, and, as the Supreme Court has said, the words "terms and conditions of employment" do "plainly cover termination of employment." *Fibreboard, supra*, 379 U.S. at 210, 85 S.Ct. at 402.

FNM has offered no evidence to rebut the presumption arising from the literal application of the statute, but merely asserts that it was losing money on Greenpark. However, as discussed above, although certain considerations generally relating to economics may render bargaining futile and therefore nonobligatory, FNM has not shown that to be true of the considerations it claims prompted its decision to terminate the Greenpark operation.[8]

The dissent, noting that, as the Administrative Law Judge found, the company was losing money at Greenpark, argues that FNM was not required to bargain over the decision to terminate the Greenpark operation because those losses were not attributable to labor costs, since under the contract between Greenpark and FNM Greenpark paid FNM's employees' salaries and fringe benefits, plus a management fee. We believe, however, that the critical question is whether the purposes of the statute are advanced by imposition of a duty to bargain and that that determination does not depend solely on whether the costs precipitating the decision to terminate were not labor originated. What appears to us to be the decisive factor, is whether, regardless of the origin of the cost which precipitated a management decision to terminate an operation, bargaining could reasonably be expected to modify or reverse that decision. On the record here, for example, there is sufficient reason to believe that, given the opportunity, the union might have made concessions, by accepting reduction in wages or benefits (take-backs) or a reduction in the work force, which would in part or in whole have enabled Greenpark to give FNM an increased management fee. At least, if FNM had bargained over its decision to close, that possibility would have been tested, and management would still have been free to close the Greenpark operation if bargaining did not produce a solution. Moreover, the dissent appears to us to be unsound in placing emphasis on the question whether the company's difficulties are attributable to non-labor costs alone. As we see it, such difficulties are the product of the company's entire history and arise from the sum of the costs involved in running a business.

---

7. The dissent maintains that despite our purported rejection of a per se rule favoring the imposition of the duty to bargain, in effect one has been adopted. This is not so because, as discussed in the text above, our ruling would exclude the imposition of a duty to bargain on a showing that the purposes of the statute would not be furthered by mandating bargaining in a particular case. We have suggested several examples of situations in which such a showing might be made.

8. The dissent, relying on Justice Stewart's concurrence in *Fibreboard*, concludes that FNM's decision was "a matter of fundamental entrepreneurial discretion." Although we have indicated our agreement that certain decisions may be within managerial prerogative and not subject to mandatory bargaining, the appropriate analysis to determine whether such a decision is involved in the case at hand is to inquire whether the imposition of a duty to bargain would further the purposes of the statute.

Accordingly, we find that FNM had a duty to bargain with the union as to its decision to close the Greenpark operation.[9]

FNM argues that it nevertheless did bargain with the union on July 28th and 29th, and therefore satisfied its duty to bargain as to its decision to close its Greenpark services.

However, the telephone conversations, initiated by the union, consisted of little more than Marsh informing Wecker that FNM was "pulling out" of Greenpark for financial reasons and that there was "nothing to discuss."[10] It is difficult to conceive of conduct which more clearly constitutes a failure of good faith bargaining to an impasse.

## V.

FNM argues that the Board abused its power by ordering FNM to reinstate the terminated employees and awarding them backpay. The Board answers that FNM failed to except to the remedy before the Board and is therefore precluded from objecting to it here.

A condition to the right to object to the enforcement of a remedy ordered by the NLRB is that the party opposing must have excepted to the remedial portion of the order before the NLRB. *NLRB v. Seven-Up Bottling Co.*, 344 U.S. 344, 350, 73 S.Ct. 287, 290, 97 L.Ed. 377 (1953); National Labor Relations Act § 10(e), 29 U.S.C. § 160(e).

FNM contends that its exceptions to the ALJ's decision and its accompanying brief objected to the remedial portion of the

order. This is simply not supported by the documents[11] themselves which do not mention the remedy ordered.

FNM next argues that the General Counsel's cross-exceptions to the ALJ's decision questioned the relief ordered and "fully bring the question of remedial relief before the Board within the meaning of Section 10(e)." However, the Board's exceptions did not object to the remedy ordered. Rather they requested further relief in addition to that ordered. The General Counsel's exceptions could not have the effect of notifying the NLRB that FNM "intend[ed] to press the specific issue it now raises." *NLRB v. Seven-Up Bottling Co., supra,* 344 U.S. at 350, 73 S.Ct. at 290.

The petition for enforcement is granted.

KEARSE, Circuit Judge, concurring in part and dissenting in part:

I must respectfully dissent from so much of the majority's decision as holds that respondent violated Sections 8(a)(5) and (1) of the National Labor Relations Act (the "Act"), 29 U.S.C. §§ 158(a)(5), 158(a)(1) by refusing to bargain over its decision to close its Greenpark operation, and I would therefore deny enforcement of so much of the NLRB's order as directs respondent to pay backpay to the employees terminated.

### I

There is no question that respondent failed to bargain with the union, nor any question that it was required to bargain over the *effects* of its decision to terminate

---

9. In *Brockway,* the court declined to enforce the NLRB order and remanded because of the insufficient factual record to enable it to balance the employer's interest in not bargaining. 582 F.2d at 739–40. That course is unnecessary here. Neither party has claimed, and we do not find, that the record is insufficient to permit determination of the question before us, see *Electrical Products Division of Midland-Ross Corp. v. NLRB,* 617 F.2d 977, at 982 (3d Cir. 1980).

10. Marsh stated during the telephone conversation that if FNM stayed at Greenpark one day, it was then bound to stay for a full 30 days. There was also some discussion concerning the

possibility of persuading Greenpark to waive the 30-day contractual provision.

11. The exceptions to the ALJ's decision were:

"1. Exception is hereby taken to the conclusion of the Administrative Law Judge that the Respondent was under a duty to bargain with the Union over the decision to terminate the contract with Greenpark Care Center. . . ."

"2. Exception is hereby taken to the conclusion of the Administrative Law Judge that the Respondent failed to bargain with the Union over the effects of its decision to close the operation. . . ."

its operations at Greenpark Care Center ("Greenpark"). *See NLRB v. Rapid Bindery, Inc.*, 293 F.2d 170, 176 (2d Cir. 1961); *Morrison Cafeterias Consol. Inc. v. NLRB*, 431 F.2d 254 (8th Cir. 1970); *NLRB v. Royal Plating & Polishing Co.*, 350 F.2d 191 (3d Cir. 1965). To this extent I would affirm the Board's findings that respondent violated the Act.

I cannot agree, however, that respondent violated the Act by refusing to bargain over the decision to terminate. The decision to end services at Greenpark was made in order to stop losing money. This is not a case in which, as the majority states, the respondent "merely asserts" that it was losing money on the Greenpark operation. The record indicated that during the spring of 1977 respondent had repeatedly sought an increase in its fee in order to enable it to continue services at Greenpark, stressing to Greenpark's management that respondent was losing money. The Administrative Law Judge ("ALJ") found this assertion to be true: *"It is a fact the Respondent was losing money on this job."* (Emphasis added.)

Further, in the present case the contract between respondent and Greenpark required Greenpark, in addition to paying a set management fee, to pay respondent's "gross weekly payroll and fringe benefits" for that facility. It was the amount of the

management fee, over and above the labor costs, on which respondent and Greenpark could not agree. Thus, the facts are that respondent was losing money on the Greenpark job, that its losses were not due to labor costs,[1] and that its solution for these losses was to close down the losing operation.

I do not believe that the carefully limited decision in *Fibreboard Paper Prods. Corp. v. NLRB*, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964), or any other authority, requires the respondent to bargain over its decision to terminate Greenpark in order to halt these losses.[2] *See Morrison Cafeterias Consol. Inc. v. NLRB, supra.* In *Fibreboard*, the Supreme Court ruled that "the replacement of employees in the existing bargaining unit with those of an independent contractor to do the same work under similar conditions of employment" violated the requirement of § 8(d) of the Act that an employer bargain about "conditions of employment." *Id.* 379 U.S. at 215, 85 S.Ct. at 405. Unlike the present case, *Fibreboard* involved the replacement of employees in an ongoing operation. (And unlike the present case the costs sought to be shaved in *Fibreboard* were labor costs.) The opinions in *Fibreboard* are instructive in distinguishing its "contracting out" situation from that of the present case.[3] Thus, the majority opinion observed as follows:

1. This distinguishes such cases as *Ozark Trailers, Inc.*, 161 N.L.R.B. 561 (1966) in which the company's actions were prompted in large part because of the cost of labor. Even in a case where a partial closing is due to labor costs, it may be that a labor union's legitimate interests are adequately protected by the employer's duty to bargain over the effects of the closing, as distinguished from the decision itself to close. There is no need to reach that question here.

2. The majority states that, like the Third Circuit in *Brockway Motor Trucks v. NLRB*, 582 F.2d 720 (3d Cir. 1978), it recognizes merely a presumption, and not a per se rule, that there is a duty to bargain over a partial closing. Looking at the results of the two cases, however, it appears to me that the majority comes rather near to imposing that per se rule. In *Brockway*, the parties had stipulated that the partial closing was based on "economic considerations." The nature of these considerations was

not disclosed in the record, and thus it could not be known whether or not that respondent had actually been losing money on the closed operation. In those circumstances the presumptive duty to bargain was not adequately rebutted. Yet the *Brockway* court did not grant enforcement, but denied the Board's petition without prejudice. In the present case, the established facts are considerably less compelling from the Board's point of view. There is a record on which the ALJ expressly found that in fact respondent was losing money; and the record shows that those losses were not due to labor costs. Yet here, the majority promptly grants enforcement.

3. Far from deciding such questions as a decision to terminate an operation altogether, *Fibreboard* did not purport to reach even "other forms of 'contracting out' or 'subcontracting.' " *Id.* at 215, 85 S.Ct. at 405.

The facts of the present case illustrate the propriety of submitting the dispute to collective negotiation. The Company's decision to contract out the maintenance work did not alter the Company's basic operation. The maintenance work still had to be performed in the plant. No capital investment was contemplated; the Company merely replaced existing employees with those of an independent contractor to do the same work under similar conditions of employment. Therefore, to require the employer to bargain about the matter would not significantly abridge his freedom to manage the business.

The Company was concerned with the high cost of its maintenance operation. It was induced to contract out the work by assurances from independent contractors that economies could be derived by reducing the work force, decreasing fringe benefits, and eliminating overtime payments. These have long been regarded as matters peculiarly suitable for resolution within the collective bargaining framework . . . .

*Id.* at 213–14, 85 S.Ct. at 404. Justice Stewart's concurring opinion stresses that certain managerial decisions, such as the decision to close a business, which obviously will affect employment, do not implicate "conditions of employment" within the meaning of § 8(d):

Nothing the Court holds today should be understood as imposing a duty to bargain collectively regarding such managerial decisions, which lie at the core of entrepreneurial control. Decisions concerning the commitment of investment capital and the basic scope of the enterprise are not in themselves primarily about conditions of employment, though the effect of the decision may be necessarily to terminate employment. If, as I think clear, the purpose of § 8(d) is to describe a limited area subject to the duty of collective bargaining, those management decisions which are fundamental to the basic direction of a corporate enterprise or which impinge only indirectly upon employment security should be excluded from that area.

*Id.* at 223, 85 S.Ct. at 409–410.

I conclude that the respondent's decision in this case to conserve its capital by closing a losing operation was a matter of fundamental entrepreneurial discretion and was not "suitable for resolution within the collective bargaining framework."

II

Respondent has challenged in this Court both the order directing it to reinstate terminated employees and the backpay award. The Board argues that these questions are not properly before the Court because respondent's letter of exceptions to the ALJ's decision was "silent on remedy and too general in form to have placed the Board on notice that the Company objected to the remedy in the event its position did not prevail." (Board brief at 21.) This position has some merit with respect to the Board's direction that respondent offer to reinstate terminated employees in comparable positions in other facilities served by respondent; that order was properly based on respondent's failure to bargain over the effects of its termination decision, and I would agree that respondent is barred from attacking that portion of the remedy.

Nevertheless, I would not hold the respondent barred from challenging the backpay award, because that award is based on the determination that the company violated the Act by failing to bargain over the termination decision itself. Since I find this premise faulty, I find no basis for the backpay award and would deny enforcement of that portion of the Board's order. *NLRB v. Rapid Bindery Inc., supra,* 293 F.2d at 177.